IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ASHLEY BROWN, | ) | |
| | ) | No. 32761-2-III |
| Appellant, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| DEPARTMENT OF SOCIAL AND | ) | PUBLISHED OPINION |
| HEALTH SERVICES, CHILD | ) | |
| PROTECTIVE SERVICES, | ) | |
| | ) | |
| Respondent. | | |

FEARING, J. — The Department of Social and Health Services (DSHS) found Ashley Brown to have "neglected" her son John, within the meaning of RCW 26.44.020(16), because she did not immediately seek treatment for John when he suffered burns while in the care of Brown's boyfriend. John is a fictitious name we give the son. Brown cared for the wound on her own for ten days by applying cream. She later sought treatment at a local hospital emergency room when the burn bled. Because the record does not establish that Brown's conduct constituted a serious disregard of consequences of such magnitude as to constitute a clear and present danger to her child's health, we reverse DSHS' finding and dismiss the allegation of neglect against Brown. In so

No. 32761-2-III
*Brown v. Dep't of Soc. & Health Servs.*

holding, we emphasize the lack of evidence that taking John for medical care at an earlier date would have resulted in different treatment of the burn.

## FACTS

This statement of facts relies on testimony of witnesses at an administrative hearing, while heavily borrowing from the administrative law judge's findings of fact based on the hearing. Ashley Brown, Brown's boyfriend Joshua Brink, and Brown's two-year-old son, John, resided in a trailer in Elk, a rural community in Spokane County. Brown enjoys working with children and wishes to help children who lived in an abusive home.

On the evening of November 27, 2012, while Ashley Brown worked and Joshua Brink cared for John, John suffered burns on his scrotum and buttocks. Brink claimed that John sustained the burns when John opened the flow of water from the hot water faucet while sitting in the tub. Brink had left the bathroom to answer the home's front door.

According to Joshua Brink, his co-worker, Alexa Groce, knocked on the home's door and he answered the knock. While Brink and Groce chatted, the two heard John scream, and both ran to the bathroom. Brink found John sitting on his butt with his knees bent so his feet were against the wall of the tub. John used the walls of the tub to balance himself as the tub filled with scalding water. Only a little water was inside the tub.

2

The water burned John's bottom and scrotum. Joshua Brink immediately removed John from the tub and placed him in cold water for ten to fifteen minutes. The record contains a conflict as to whether Brink saw John's skin peel after removing the young boy from the cold water. Neither Brink nor Alexa Groce deemed it necessary to transport John to the emergency room.

After tending to John, Joshua Brink called Ashley Brown, who worked as the manager for a Subway restaurant. Brink informed Brown that John suffered burns in the bathtub. Brown immediately came home to care for John. When Brown arrived at home, John was not crying and was sitting down.

Upon returning home on the evening of November 27, Ashley Brown examined the burn. She later described the wound as red, white and "wrinkly," and similar to a sunburn. Clerk's Papers (CP) at 241. Brown researched child burn care on the Internet and learned to apply cream or ointment and to continue observation of the burn. According to the Internet, if the child's condition did not improve in seven days, the parent should take the child to the hospital.

On the night of November 27, Ashley Brown drove to Wal-Mart. She purchased burn cream, returned home, and applied the cream to John's burn. That night both Joshua Brink and Brown spoke with their respective mothers on the phone about nursing the burn. Brink's mother formerly worked as a pharmacist at Spokane's Holy Family Hospital. She advised the couple to keep John's diaper dry and to take the boy to the

3

hospital on any sign of infection. Brown observed John during the nights of November 27-28 and changed his diaper as soon as he soiled it.

On November 28, 2012, Joshua Brink took John with him to work at Groce Logging as he normally did. Ashley Brown had obtained a domestic violence restraining order against John's biological father, Curtis Diaz, preventing Diaz from contacting John and her. Diaz threatened to remove John from daycare while Brown worked, so Brink took John to work, where Alexa Groce watched the toddler.

On November 28, Joshua Brink asked his boss, Robert Groce, a logger certified in first aid, to examine the burn, which Groce did. Groce had earlier played with John and did not notice John suffering from any ailment. Groce later described the burn, as it appeared on November 28, as "a perfect, round little circle." CP at 168. He did not recommend any medical treatment. Groce, who saw John nearly every day for the next ten days, noticed no change in John's behavior during the week and one-half. John did not scream or cry.

Beginning on November 28, 2012, Ashley Brown treated John's burn with cream and by frequently changing John's diaper. On November 29, Brown returned to Wal-Mart and spoke with a pharmacist. The pharmacist recommended continued application of burn cream and giving John children's Tylenol for pain. Brown also applied burn ointment from her work's first aid kit. Until either December 3 or 4, John actively played and suffered no fever. He sat down without discomfort and ate at the table. The burn

4

appeared to heal.

On either December 3 or 4, 2012, John appeared weary and lacked an appetite. On December 7, Joshua Brink noticed bleeding of the burn, and he took John to Ashley Brown. Brown took John to Providence Holy Family Hospital.

On December 7, 2012, Dr. Michael Sicilia examined John at Providence Holy Family Hospital. Dr. Sicilia observed John as "active and playful" and in good health, except for the burn. Administrative Record (AR) at 222. John had no fever. Sicilia found no blistering and diagnosed John with "burn cellulitis." AR at 224.

At Providence Holy Family Hospital, Michael Sicilia drew John's blood. John had a slightly elevated white blood cell count. Ashley Brown testified that Providence Holy Family told her that the blood test showed that John suffered a severe infection that reached his bloodstream. Medical records and other testimony do not confirm a severe infection or an infection that reached the bloodstream. Holy Family Hospital placed John on an intravenous antibiotic drip and transferred him to Spokane's Sacred Heart Hospital by ambulance. Holy Family arranged the transfer because it did not admit children under the age of six years old.

On December 7, Sacred Heart Hospital's Dr. Michelle Messer evaluated John. Dr. Messer specializes in child abuse and neglect and is recognized in Spokane as a child abuse expert. Messer observed that John was alert and cooperative. Messer did not find John in pain, although he was uncomfortable. John whimpered and said "ouie" when

Messer removed his diaper. AR at 228. Messer noted that John had:

> an extensive burn to the buttocks bilaterally with involvement as
> well of the perianal area and the ventral side of the scrotum and shaft of the
> penis along the median raphe. These burned areas are a mixture of bright
> red burns with some edge to the periphery of the burn and areas within the
> burned skin that are yellow in color. There are areas of new vascular
> structure being present. Of note, there are no burns elsewhere on the body
> whatsoever.

AR at 228.

Michelle Messer found John's wounds troubling and inconsistent with the story
Ashley Brown told her concerning the origin and cause of John's burns. Dr. Messer
concluded that the burns were "abusive in nature." AR at 229. She took photos of the
burns. Messer treated John's wound with burn cream and instructed a wound care nurse
to monitor John for future treatment. Messer diagnosed John with second and possibly
third degree burns and opined that John must suffer from considerable pain. Messer was
uncertain as to whether John garnered a blood infection. Assuming the burn was
infected, there was no septic infection since bacteria had not overwhelmed the
bloodstream. Messer found no other injuries or ailments to John other than the burn.

Dr. Messer asked Ashley Brown why Brown had not driven John to a physician or
hospital on the day of the burns. Brown replied that John did not act as if in pain and the
burn did not look as bad as the day that Messer observed the burn.

On December 7, Dr. Michelle Messer contacted Child Protective Services (CPS),
placed a hospital administrative hold on John, and requested that law enforcement

6

interview Ashley Brown. Sacred Heart Hospital admitted John and gave him Ibuprofen during the day and Oxycodone in the evening for pain. John was active at the hospital. The hospital administered John Oxycodone against Brown's wishes, because Brown, in part, did not want John awakened at night for purposes of administering the drug.

Due to CPS' administrative hold, John remained in the hospital from December 7 to December 12. Sacred Heart would have otherwise released John by December 9.

During an investigation of Ashley Brown, CPS reviewed all of John's medical records. The records showed that Brown previously took John to the emergency room ten times for minor ailments such as the flu, croup, diarrhea, and an ear infection.

CPS initiated a dependency for John and scheduled a shelter care hearing for December 12, 2012. CPS allowed Ashley Brown to stay with John in the hospital while awaiting the shelter care hearing. At the shelter care hearing, Brown stipulated to a six-month dependency. CPS then released John into Brown's grandmother's care. John could not return to Brown's home because CPS forbade contact between Joshua Brink, and John and Brown had lived with Brink. Brown temporarily lived with her grandmother in order to care for John. Brown participated in all services recommended by CPS, and a judge subsequently dismissed the dependency action.

## PROCEDURE

Separate from the dependency action and on December 14, 2012, DSHS served Ashley Brown a notice of a finding that she engaged in neglect by reason of negligent

7

treatment or maltreatment of John, when failing to seek immediate medical treatment for the burn. This finding is the subject of this appeal. DSHS never alleged that Brown caused the burn or neglected John by leaving him in the care of Joshua Brink. On January 9, 2013, Brown requested review of DSHS' finding. On January 10, 2013, DSHS' Division of Child and Family Services affirmed the finding. On March 11, 2013, Brown requested an administrative hearing.

On August 28, 2013, an administrative law judge (ALJ) conducted a hearing on Ashley Brown's appeal. Jackie Brown, the mother of Ashley Brown, Robert Groce, and Brown testified for Brown. Dr. Michelle Messer and social worker Nadean Roper testified for DSHS. The ALJ recognized Messer as an expert in child abuse and neglect and in the general medical field.

At the administrative hearing, Dr. Michelle Messer testified that she disbelieved Joshua Brink's story about the origin and cause of the burn. Messer testified that, if scalding bath water caused the burn, John's bottom would not have burned because of his buttocks being in direct contact with the cold tub. Instead the scalding water would have burned the tops of John's feet, the lower portion of his leg, and the top of his genitals if the water splashed. Messer based her opinion on Joshua Brink's statement that John did not hold himself over the water, but remained sitting while the water pooled around him. Messer also believed that John suffered pain beyond that described by Joshua Brink and Ashley Brown. Nevertheless, Messer conceded that if John's burns were "that bad" he

8

would have periodically screamed or cried in the days following the injury. CP at 118. During her testimony, Dr. Messer did not recall what treatment Sacred Heart gave to John for the burn.

At the hearing, DSHS' counsel asked Michelle Messer if Ashley Brown was "either abusive or negligent in her treatment of [John]?" CP at 88. Dr. Messer declared that a reasonable person, confronted with the wounds of John on the night of November 27, would have immediately called a physician's office or an insurance company's nurse or transported the child to a hospital emergency room. According to Messer, a reasonable person would not treat a child with John's burns by speaking to a pharmacist at a Walmart. Messer did not clarify whether her testimony only applied to a Walmart pharmacist or all pharmacists. Messer characterized Ashley Brown's conduct as "medical neglect." CP at 11. Dr. Messer conceded that John's burn may have looked differently the day of the injury from the day Messer saw John. Dr. Messer did not know whether debridement would have been a prescribed treatment for John had he been seen earlier.

John's treating pediatrician, Dr. Samir Keblawi, provided a declaration in support of Ashley Brown. Keblawi has treated John since John's birth. He treats scalding burns on children multiple times each year. Dr. Keblawi examined John's medical records, including the photographs taken by Dr. Messer of John's wound. He first saw John for the burns on December 19.

Samir Keblawi determined that John's injury was consistent with Ashley Brown's description of how the burn occurred and her subsequent treatment of the burn. Keblawi also stated an ordinary parent would begin medical treatment for burns at home. He further declared that even a second-degree burn remains pink in nature for several days and any signs of infection, such as redness and swelling, do not appear until several days after the burn. Dr. Keblawi noted the slightly elevated white blood cell count at Holy Family Hospital. Dr. Keblawi testified that any infection had only recently developed and that Ashley Brown's timing in seeking professional care was proper.

During the administrative hearing, Ashley Brown's counsel directed Dr. Michelle Messer to Dr. Samir Keblawi's opinion that the ordinary parent would begin medical treatment at home. Counsel then asked: if two physicians disagree as to whether the child should be taken immediately to a health care provider, how is it fair for you to testify that Ashley Brown violated a reasonable standard of care? Messer did not answer the question, but instead replied:

> I disagree with Dr. Keblawi even suggesting that this area of burn
> should have waited until the redness increased and the swelling increased.

CP at 104. Messer added that she was "willing to bet" that Dr. Keblawi "might not have realized" what he was saying. CP at 105.

Ashley Brown's counsel asked Michelle Messer for her source of what steps a reasonable person would take. Without waiting for a response, counsel added: "[o]r is

10

that something specific to the medical profession?" CP at 106. Messer responded: "I don't even know how to answer that." CP at 106.

At the administrative hearing, the CPS investigator testified that Samir Keblawi's nurse told her that Ashley Brown failed to bring John to several scheduled appointments. The record does not indicate that any of the scheduled appointments concerned the burn to the buttocks and scrotum. The investigator, in later testimony, conceded that she did not know if the purported missed appointments related to John's care and treatment or to a study in which John participated at Keblawi's office.

On October 15, 2013, the ALJ issued an initial order that upheld DSHS' finding of neglect. Ashley Brown filed a petition for review with the DSHS Board of Appeals on November 5, 2013. On January 2, 2014, a DSHS review judge issued a review decision and final order affirming the ALJ's initial order and adopting the ALJ's findings. In upholding the finding of neglect, the review judge affirmed the ALJ's decision to give greater weight to Dr. Messer's testimony than to the declaration from Dr. Keblawi. The review judge concluded: "The challenged credibility determinations were neither made arbitrarily nor capriciously and do not constitute an abuse of discretion by the ALJ. They cannot be reversed on review." AR at 11-12.

In the DSHS final order, the review judge wrote:

> The undersigned recognizes the advantage of viewing the entire factual record in "hindsight," an advantage not available to the Appellant [Ashley Brown] the evening she left work to return home to tend to her

11

injured son. However, it was the lack of medical knowledge on the part of the Appellant at the time as to the possible consequences of the burn injury, that should have compelled the Appellant to seek immediate medical attention for her child. This lack of medical knowledge, coupled with the large area of the burn relative to the child's small size and the sensitive area of the burn, all indicate that immediate medical attention should have been sought for the child. A failure to take the "safe rather than sorry" route or to exercise the most cautious conduct will not always support a finding of negligent treatment or maltreatment. However, in some cases such actions or omissions do warrant such a finding. A review of the entire record in this case supports the ALJ's finding that *any reasonable person would have sought medical care for the child right away.*

. . . .

The fact that the Appellant took some action in response to the injury does not necessarily create a successful defense to the finding of neglect. Further, in a case of neglect, the Department does not need to prove that the Appellant intended to neglect or otherwise harm the child. The Department needs only to prove that the actions taken by the Appellant that constitute neglect were not accidental. The Appellant's decision to seek only the advice of laypersons who may or may not have observed the injury or from persons with some medical knowledge, such as the pharmacist, without actually presenting the child for observation was not accidental. The Appellant's action in failing to immediately take her son to the hospital or doctor after the burn incident was a conscious act. Based on the Appellant's own lack of medical knowledge; her uncertainty as to what actually occurred due to her not being there when the injury occurred; the reported screaming of her son upon being scalded by hot water; the evidence that a burn had occurred; the extensiveness of the injured area; the sensitive nature of the area injured; and the potential inability by a layperson to perceive eventual consequences caused by scalding, all dictate that the Appellant should have sought immediate medical attention for her toddler son. *For these reasons, the Appellant's failure to immediately seek medical aide showed a serious disregard of the consequences to her son of such a magnitude that it did create a clear and present danger to [John's] health, welfare, and safety*, as was borne out by the horrendous subsequent symptoms of the injury including excessive blistering, bleeding, and the onset of infection.

CP at 19-20 (emphasis added).

DSHS entered the following findings in support of its final order:

> [Finding of fact] 14: . . . The substantial area affected by the burn, the distribution of the burn including the genitalia, and the severity of the burn would have caused any reasonable person to seek medical care for the child right away.
>
> [Finding of fact] 15: . . . Further, she [Dr. Messer] opined that the pain experienced by the child would have been far worse than any sunburn, the pain would have been "pretty bad." Dr. Messer opined that the failure to obtain medical treatment for the serious burn injury sustained by Kameron was medical neglect. Burns on the genitalia are especially serious and can lead to scarring, infection, or disability. In Dr. Messer's opinion, based on what she observed, it would have been apparent at the time of the incident that the burn needed medical attention.

CP at 11 (footnote omitted).

Ashley Brown filed, with the superior court, a petition for review of the agency order. In her petition for review, Brown alleged that DSHS' final order misinterpreted the standard of neglect and placed an impossible standard on parents when determining when to obtain medical care for their children. Brown also asserted that the order erroneously interprets and applies WAC 388-15, WAC 388-02, RCW 34.05 and RCW 26.44. The superior court upheld DSHS' decision.

During oral argument before this appeals court, the court asked DSHS counsel: what could have or would have been done at the emergency room the day of the injury that was not done by Ashley Brown? Counsel responded: "I do not know." Wash. Court of Appeals oral argument, *Brown v. Dep't of Soc. & Health Servs.*, No. 32761-2-III (June 11, 2015), at 15 min., 48 sec. to 16 min., 30 sec. (on file with court). Later counsel added

13

that, if John received medical treatment earlier, he could have gained some relief from pain. Wash. Court of Appeals oral argument, supra, at 15 min., 48 sec. to 16 min., 30 sec. The court also asked DSHS counsel: Is it critical that the court know that the hospital would have acted differently from Ashley Brown? Counsel answered: "I do not know." Wash. Court of Appeals oral argument, supra, at 16 min., 50 sec. to 17 min., 10 sec. Finally, the court questioned counsel: Did Dr. Messer testify as to what the hospital would have done if John was taken there the first day? Counsel replied: "I cannot remember, but probably not." Wash. Court of Appeals oral argument, supra, at 17 min., 10 sec. to 17 min., 33 sec.

## LAW AND ANALYSIS

Ashley Brown contends before this court that: (1) DSHS erroneously interpreted and applied RCW 26.44.020(16) and WAC 388-15-009(5), (2) substantial evidence does not support the finding that her conduct amounted to child neglect, (3) the DSHS review judge erroneously concluded that he could not reweigh the evidence, and (4) DSHS' finding of neglect was arbitrary and capricious. We only address assignments of error one and two. Brown also seeks attorney fees and costs under the Equal Access to Justice Act, RCW 4.84.350, and RAP 18.1.

### Abuse of Children Act

DSHS imposed a finding of neglect on Ashley Brown pursuant to chapter 26.44 RCW, the abuse of children act. Under the scheme devised by chapter 26.44 RCW,

14

health care providers and other mandatory reporters must inform a law enforcement agency or DSHS when he or she "has reasonable cause to believe that a child has suffered abuse or neglect." RCW 26.44.030(1)(b). If contacted, DSHS must investigate the allegation against the alleged perpetrator, and the agency may take the child into custody. RCW 26.44.050.

Once DSHS completes its investigation, the agency must notify the alleged perpetrator of its finding. RCW 26.44.100(2). The alleged perpetrator may ask for review of the finding by DSHS. RCW 26.44.100(2)(d), .125(1). DSHS must then review the initial finding and amend it as appropriate. RCW 26.44.125(4).

If, following agency review, DSHS sustains the finding of neglect, the alleged perpetrator may request an adjudicative hearing to contest the finding. RCW 26.44.125(5). The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs the adjudicative proceeding. RCW 26.44.125(5).

If the finding of neglect stands, DSHS may use the finding in any subsequent investigation or proceeding related to child protection or child custody. RCW 26.44.100(2)(b). The finding may disqualify the perpetrator from being licensed as a child care provider, being employed by a licensed child care provider, or being authorized by DSHS to care for children. RCW 26.44.100(2)(c), .125(2)(e). The finding prevents the perpetrator from volunteering in his or her child's school or accompanying the child on school field trips. WAC 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(4)(a).

15

Ashley Brown appealed to the superior court and to this court pursuant to the APA, and requests relief from DSHS' finding of neglect against her. RCW 34.05.570 controls judicial review of an agency action. The statute reads, in part:

> (1) Generally. Except to the extent that this chapter or another statute provides otherwise:
> (a) The burden of demonstrating the invalidity of agency action is on the party asserting invalidity;
> . . . .
> (d) The court shall grant relief only if it determines that a person seeking judicial relief has been substantially prejudiced by the action complained of.

DSHS does not dispute that its decision substantially prejudiced Ashley Brown.

RCW 34.05.570(3) covers challenges to agency adjudicative proceedings and lists nine grounds on which a court may grant relief from an agency order. Ashley Brown relies on two of the nine grounds:

> (d) The agency has erroneously interpreted or applied the law;
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . .

When reviewing an agency decision, we apply the standards of chapter 34.05 RCW directly to the agency's record without regard to the superior court decision. *Goldsmith v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 573, 584, 280 P.3d 1173 (2012); *Burnham v. Dep't of Soc. & Health Servs.*, 115 Wn. App. 435, 438, 63 P.3d 816 (2003).

We hold that the DSHS Board of Appeals erroneously interpreted and applied RCW 26.44.020 by incorporating a "reasonable person" standard into the legal standard

required to uphold a finding of neglect or abuse against a parent. We apply the correct standard, as provided in the plain language of the statute, and hold that DSHS' finding of neglect against Ashley Brown is not supported by substantial evidence.

## Issues on Appeal

As a preliminary matter, DSHS contends that Ashley Brown did not preserve, before the superior court, her contention that DSHS wrongly interpreted the law, and thus DSHS argues that she may not raise this contention before this court. We read the record otherwise. In her petition for review filed with the superior court, Brown alleged that DSHS' final order misinterpreted the standard of neglect and placed an impossible standard on parents when determining when to obtain medical care for their children. Brown also asserted that the order erroneously interpreted and applied WAC 388-15, WAC 388-02, RCW 34.05 and RCW 26.44. DSHS forwards no information that Ashley Brown abandoned these arguments before the superior court.

## Standard for Finding Abuse or Neglect

We first address the DSHS Board of Appeals' interpretation and application of RCW 26.44.020 in upholding DSHS' finding of neglect against Ashley Brown.

This court's duty in statutory interpretation is to discern and implement the legislature's intent. *Lowy v. PeaceHealth*, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012). When this court interprets a statute or regulation, it gives the words in that statue or regulation their plain and ordinary meaning. *Tesoro Ref. & Mktg. Co. v. Dep't of*

17

*Revenue*, 164 Wn.2d 310, 322, 190 P.3d 28 (2008); *Stevens v. Brink's Home Sec., Inc.*, 162 Wn.2d 42, 47, 169 P.3d 473 (2007). We decipher a statute in such a way as to give effect to all language used, rendering no part superfluous. *In re Det. of Ambers*, 160 Wn.2d 543, 552, 158 P.3d 1144 (2007); *State v. Young*, 125 Wn.2d 688, 696, 888 P.2d 142 (1995). This court may look to related statutes when interpreting a regulation. *Mader v. Health Care Auth.*, 149 Wn.2d 458, 473, 70 P.3d 931 (2003). Questions of statutory or regulatory interpretation are reviewed de novo. *Tesoro*, 164 Wn.2d at 316.

"Abuse" and "neglect" are indeterminate words that could benefit from circumscription. RCW 26.44.020(1) defines "abuse or neglect" as:

> sexual abuse, sexual exploitation, or injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety, excluding conduct permitted under RCW 9A.16.100; *or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child.*

(Emphasis added.) In turn, RCW 26.44.020(16) reads, in pertinent part:

> (16) "Negligent treatment or maltreatment" means an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that *evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health,* welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

(Emphasis added.) WAC 388-15-009(5), a DSHS regulation, expands the definition of "negligent treatment or maltreatment" by listing some examples:

> Negligent treatment or maltreatment includes, but is not limited to:

(a) Failure to provide adequate food, shelter, clothing, supervision, or health care necessary for a child's health, welfare, or safety. Poverty and/or homelessness do not constitute negligent treatment or maltreatment in and of themselves;

(b) Actions, failures to act, or omissions that result in injury to or which create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child; or

(c) The cumulative effects of a pattern of conduct, behavior or inaction by a parent or guardian in providing for the physical, emotional and developmental needs of a child's, or the effects of chronic failure on the part of a parent or guardian to perform basic parental functions, obligations, and duties, when the result is to cause injury or create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child.

We glean from the regulation and the two definitions found in RCW 26.44.020 that Ashley Brown's conduct comprises "abuse or neglect" if she failed to provide adequate health care, which failure showed a serious disregard of the consequences to John of such magnitude that it created a clear and present danger to the child's health.

Contradictions within the language engraved in RCW 26.44.020 complicate our interpretation of the statute. The word "negligent" creates dissonance when compared to the definition of "negligent treatment or maltreatment" found in subsection 16 of the statute. The phrase in subsection 16, "a serious disregard of the consequences of such magnitude . . . [that it created] a clear and present danger to the child's health," does not correspond with the common law definition of "negligence." The juxtaposition of words conflicts with the meaning assigned those terms in the law.

"Negligence" is the failure to exercise such care as a reasonable person would

exercise under the same or similar circumstances. *Schwartz v. Elerding*, 166 Wn. App. 608, 615, 270 P.3d 630 (2012). Nevertheless, RCW 26.44.020's definition of "negligent treatment" references "a serious disregard of the consequences," which is more analogous to the "utter disregard" for another's safety test applied to claims of wanton misconduct. Wanton misconduct, and by extension "utter disregard," are in no way connected with negligence. *Crowley v. Barto*, 59 Wn.2d 280, 285, 367 P.2d 828 (1962). In the setting of child neglect, the State must show "serious disregard." "Utter disregard" may be more serious than "serious disregard." But "serious disregard" implies greater blame than want of reasonable care or negligence.

An actor's conduct is in "reckless disregard" of the safety of another if he or she intentionally does an act or fails to do an act which it is his or her duty to the other to do, knowing or having reason to know of facts that would lead a reasonable person to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him or her. *Adkisson v. City of Seattle*, 42 Wn.2d 676, 685, 258 P.2d 461 (1953). We see no difference between "serious disregard" and "reckless disregard." Reckless and serious disregard signifies a higher degree of culpability than acting unreasonably or affording "negligent treatment."

Under RCW 26.44.020(16), Ashley Brown's conduct must be "a serious disregard of consequences of such magnitude." The word "magnitude" is defined in part as

20

"greatness of size or extent." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1360 (1993). The legislature's use of the word "magnitude" implies Brown's misconduct must be of a greater level of fault than negligence.

Finally, Ashley Brown's conduct must constitute "a clear and present danger" to John's health. The origin of the expression "clear and present danger" lies in Justice Oliver Wendell Holmes' decision in *Schenck v. United States*, 249 U.S. 47, 52, 39 S. Ct. 247, 63 L. Ed. 470 (1919) wherein the United States Supreme Court determined when government may place limits on First Amendment freedoms of speech, press, and assembly. Under Washington law, speech will be protected unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. *City of Bellevue v. Lorang*, 140 Wn.2d 19, 27, 992 P.2d 496 (2000). Therefore, use of the idiom "clear and present danger" in RCW 26.44.020(16) further suggests more serious misconduct than mere negligence.

We must decide whether to uphold a reasonable person standard because of use of the statutory phrase "negligent treatment" or to require a higher standard because of the lengthy language that defines "negligent treatment." We adopt the lengthy language in part because it is lengthier than the shorthand use of the term "negligent treatment." The length of the later phrase shows more thought on behalf of the legislature and suggests that the legislature wanted the concept of "serious disregard of the consequences" to assume priority. The extensive clause "serious disregard of the consequences to the child

21

of such magnitude that it creates a clear and present danger to the child's health" is more specific than the expression "negligent treatment." When we face an inescapable conflict between a statute's general and specific terms, the specific terms prevail. *City of Spokane v. Taxpayers of the City of Spokane,* 111 Wn.2d 91, 102, 758 P.2d 480 (1988); *State v. Stately,* 152 Wn. App. 604, 609, 216 P.3d 1102 (2009).

RCW 26.44 is not a licensing scheme, but a finding of neglect can preclude one from obtaining a child care license. RCW 26.44.100(2)(c), .125(2)(e). Licensing statutes are in derogation of the common law and must be strictly construed. *Kilthau v. Covelli,* 17 Wn. App. 460, 463, 563 P.2d 1305 (1977); *Hendrick's Elec., Inc. v. Plumley,* 18 Wn. App. 440, 442, 569 P.2d 73 (1977). Strict construction of RCW 26.44.020 demands the imposition of a standard higher than negligence.

Two Washington decisions address RCW 26.44.020(16), and further support this court's strict application of the definition of "negligent treatment." In *Marcum v. Department of Social and Health Services,* 172 Wn. App. 546, 290 P.3d 1045 (2012), this court vacated a finding of neglect DSHS entered against Melinda Marcum, a daycare provider, who mistakenly left a child alone for ten minutes. DSHS, on the basis of WAC 388-15-009(5), found that Marcum committed per se neglect because she left the child unattended, regardless of whether her conduct created a clear and present danger to the child's safety.

22

This court found WAC 388-15-009(5) beyond DSHS' authority to the extent the regulation did not require a finding of clear and present danger. It held that "DSHS lacks authority to promulgate and interpret a rule that fundamentally shifts the standard required to make a neglect finding." *Marcum*, 172 Wn. App. at 559. The court reasoned that it could not "as a matter of law, conclude that DSHS has the legislative authority to implement a strict liability regime for the negligent treatment of children." *Marcum*, 172 Wn. App. at 559.

In *Morgan v. Department of Social and Health Services*, 99 Wn. App. 148, 992 P.2d 1023 (2000), this court affirmed a finding of "negligent treatment or maltreatment" against June Morgan, a licensed foster care provider, whose provider license DSHS revoked. Among other conduct, Morgan called the children "bitches" and used profanity in their presence. She pulled the children's ears. Morgan left a 14-year-old developmentally delayed child at a skating rink without adult supervision. The child then suffered a seizure and lost consciousness. This court employed a strict application of the definition of "negligent treatment" when adjudicating Morgan's appeal.

In short, although the legislature employed the term "negligent treatment" in RCW 26.44.020(16), a reading of the full statute shows a desire by the legislature not to sanction a parent for simple negligence. Good reason exists to reject a negligence benchmark. A negligence standard could place every Washington parent in jeopardy because what is "reasonable" under a negligence regime varies depending on the situation

23

and actors involved. Such a standard might also implicate a parent's fundamental liberty interest in the care and custody of her children. *See* U.S. CONST. AMENDS. V, XIV; WASH. CONST., art. I, § 3; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Custody of Smith*, 137 Wn.2d 1, 27, 969 P.2d 21 (1998). Accordingly, we hold that DSHS erred in applying a "reasonable person" standard to its finding of neglect against Ashley Brown.

### Substantial Evidence

DSHS found that Ashley Brown was guilty of "serious disregard of the consequences to [the child] of such magnitude that it . . . create[s] a clear and present danger to the child's health." CP at 20. Brown argues that substantial evidence does not support the finding. We agree.

Challenges brought under the Administrative Procedure Act are reviewed for substantial evidence when viewed in the light of the entire record. RCW 34.05.570(3)(e); *William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. 403, 411, 914 P.2d 750 (1996). This court determines whether sufficient evidence exists to persuade a fair-minded person of the truth or correctness of the order. *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 565, 309 P.3d 673 (2013), *review denied*, 179 Wn.2d 1015, 318 P.3d 279 (2014). We view the evidence in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority. *Spokane County*, 176 Wn. App. at 565. Doing so necessarily entails accepting

24

the factfinder's views regarding the credibility of witnesses and the weight to be given reasonable but competing inferences. *Spokane County*, 176 Wn. App. at 565. DSHS found Michelle Messer more credible than Samir Keblawi, but did not discount the testimony of Ashley Brown's lay witnesses. To the contrary, DSHS incorporated testimony of those witnesses into its findings of fact.

The record as a whole and when viewing the evidence in favor of DSHS shows that Ashley Brown immediately returned home from work when informed by her boyfriend of the burn injury to John. Brown suffered no delay to attend to her son. Brown examined John on her arrival home. Michelle Messer opines that John was in more pain than Brown believed, but no evidence contradicts that Brown noticed a burn similar to a sunburn and John did not cry. Brown researched child burn care on the Internet and learned to apply cream or ointment and to continue observation of the burn. Brown drove to Walmart and purchased burn cream. She returned home and applied the cream to her son.

On the night of November 27, Ashley Brown took other precautions by phoning her mom. Joshua Brink also called his mother, a pharmacist, who advised the couple to keep John's diaper dry and take the boy to the hospital on any sign of infection. Brown followed the instructions.

On November 28, 2012, Robert Groce, certified in first aid, played with John and noticed no abnormality in the boy's condition or activities. At Joshua Brink's request,

Groce examined the burn. Groce did not recommend any medical treatment. Groce, who saw John nearly every day for the next ten days, noticed no change in John's behavior during the week and one-half. John did not scream or cry.

On November 29, Ashley Brown returned to Wal-Mart and spoke with a pharmacist. The pharmacist recommended continued application of burn cream and giving John children's Tylenol for pain. Brown followed the instructions. In the days following the burn, John actively played and displayed no discomfort. The burn appeared to heal.

John later appeared weary and lacked an appetite. On December 7, Joshua Brink noticed bleeding of the burn, and he took John to Ashley Brown. Brown took John for medical care. Even at the hospitals, John was active and playful. None of Ashley Brown's conduct shows a serious disregard for the health of her son such that it is of a magnitude constituting a clear and present danger.

Critical to our decision is evidence that the hospitals may have engaged in more tests and may have given stronger pain medication to John, but the hospitals essentially continued with the same care given earlier by Ashley Brown. More importantly, DSHS provided no evidence that, if Brown had taken John to a physician or clinic before December 7, a health care provider would have prescribed any different treatment from that given by Brown.

DSHS emphasizes that, on other occasions, Ashley Brown quickly shuttled John

to medical care. DSHS may suggest that Brown's failure to deliver John to a clinic on this one occasion shows she was irresponsible. Another reasonable inference, however, is that Brown was an attentive mother who on this one occasion did not consider medical care needed. DSHS may wish to suggest that Brown responded contrarily on this one occasion because she sought to hide abuse meted on John by Joshua Brink. Nevertheless, although the DSHS decision notes that Michelle Messer concluded abuse occurred, no finding of fact confirms any abuse by Brink. More importantly, DSHS did not find that Brown sought to protect Joshua Brink from charges of abuse.

DSHS premises its finding of neglect on the testimony of Dr. Messer that Ashley Brown did not respond to the burn as would a reasonable parent. Finding of fact 14 incorporates a reasonable parent standard. Nevertheless, we have already determined that the reasonable person or reasonable parent standard does not control.

DSHS notes Ashley Brown's lack of qualifications in health care and then argues that such lack of qualifications should have led her to take extra precautions. This argument ignores that John was not in distress on November 27. The argument also employs hindsight that is unbecoming even for a negligence standard. Under negligence law, courts will not view a party's acts with the clarity of hindsight. *Lee v. Javitch, Block & Rathbone, LLP*, 601 F.3d 654, 659 (6th Cir. 2010); *Yates v. Shackelford*, 336 Ill. App. 3d 796, 784 N.E.2d 330, 338, 271 Ill. Dec. 112 (2002); *Mitchell v. Allstate Ins. Co.*, 36 Colo. App. 71, 534 P.2d 1235, 1237 (1975); *Feely v. Morton*, 149 Me. 119, 99 A.2d 285,

27

288 (1953).

Michelle Messer's testimony is problematic. During the administrative hearing, Ashley Brown's counsel directed Dr. Michelle Messer to Dr. Samir Keblawi's opinion that the ordinary parent would begin medical treatment at home. Counsel then asked: if two physicians disagree as to whether the child should be taken immediately to a health care provider, how is it fair for you to testify that Ashley Brown violated a reasonable standard of care? Messer did not answer the question, but instead repeated her disagreement with Keblawi. Ashley Brown's counsel asked Michelle Messer for her source of what steps a reasonable person would take or is that something specific to the medical profession? Messer responded: "I don't even know how to answer that." CP at 106.

A physician is qualified to opine what a reasonable physician would do under certain circumstances, but we question whether a physician is qualified to testify to how a reasonable parent would act. There is no testimony that Michelle Messer is a parent. Ashley Brown's pointed questioning of Messer suggests that Messer's view of the conduct of a reasonable parent was overcome by her opinions as a well qualified physician.

We have read many decisions that relate physician testimony on the standard of care of a "reasonable parent." Only one opinion, however, answers whether such opinion testimony is appropriate. In *Applebrook Country Dayschool, Inc. v. Thurman*, 264 Ga.

28

App. 591, 591 S.E.2d 406 (2003), the Georgia Court of Appeals reversed a jury verdict after ruling that a physician's testimony regarding an "average parent" standard of care was inadmissible. The Georgia Supreme Court reversed on the basis that the physician had only testified about literature regarding positioning an infant when the baby sleeps. *Thurman v. Applebrook Country Dayschool, Inc.*, 278 Ga. 784, 604 S.E.2d 832 (2004). Despite being asked, the physician had never mentioned a standard of care. We reserve for another day or another court the issue of whether a physician is qualified to testify to the standard of care of a reasonable parent, but mention this issue in passing so that our decision is not read to support a rule that such testimony is permissible.

### Attorney Fees and Costs

Ashley Brown requests appellate fees and costs under Washington's equal access to justice act, RCW 4.84.350(1). Under RCW 4.84.350(1):

> a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, *unless the court finds that the agency action was substantially justified* or that circumstances make an award unjust.

(Emphasis added.) A "qualified person" is one with a net worth of $1 million or less. RCW 4.84.340(5). "Substantially justified" means justified to a degree that would satisfy a reasonable person. *Raven v. Dep't of Soc. & Health Servs.*, 177 Wn.2d 804, 832, 306 P.3d 920 (2013); *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 892, 154 P.3d 891 (2007). An action is substantially justified if it had a reasonable basis in law

29

and in fact. *Raven*, 177 Wn.2d at 832; *Aponte v. Dep't of Soc. & Health Servs.*, 92 Wn. App. 604, 623, 965 P.2d 626 (1998). The action need not be correct, only reasonable. *Raven*, 177 Wn.2d at 832. RCW 4.84.350(1) contemplates that an agency action may be substantially justified, even when the agency's action is ultimately determined to be unfounded. *Raven*, 177 Wn.2d at 832.

A trial court's award of attorney fees under the equal access to justice act is reviewed for abuse of discretion. *Raven*, 177 Wn.2d at 833; *Plum Creek Timber Co. v. Wash. State Forest Practices Appeals Bd.*, 99 Wn. App. 579, 595, 993 P.2d 287 (2000). A trial court abuses its discretion when it makes a decision that is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. *Moreman v. Butcher*, 126 Wn.2d 36, 40, 891 P.2d 725 (1995).

Since DSHS prevailed below, the trial court did not address an award of attorney fees for Ashley Brown. The equal access to justice act and case law contemplates that the trial court, not this court, should initially exercise discretion when determining if an action is substantially justified and what, if any, fees should be awarded. Therefore, we remand to the trial court for a determination of whether fees should be awarded Brown under RCW 4.84.350, and, if so, the amount of the award.

## CONCLUSION

We reverse the trial court and vacate DSHS's finding of neglect against Ashley Brown. We remand the case to the superior court for a determination of whether Ashley

No. 32761-2-III
*Brown v. Dep't of Soc. & Health Servs.*

Brown should be awarded attorney fees and costs against DSHS under RCW 4.84.350. If so, the superior court should exercise its discretion when determining the amount of the award.

Fearing, J.

WE CONCUR:

Siddoway, C.J.

Lawrence-Berrey, J.

31