# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| NORMA OCAK, | No. 56862-4-II |
| Respondent, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — The Washington State Department of Social and Health Services (Department) appeals the reversal of a final agency order by the Thurston County Superior Court. This final order, issued by the Department of Social and Health Services Board of Appeals (BOA), concluded that Norma Ocak neglected her adult son because she failed to request certain services for his needs and failed to prevent him from going into the community alone without proper supervision. The Department contends that Ocak's actions and inactions demonstrate a serious disregard of consequences of a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, as well as a pattern of conduct or inaction that fails to avoid or present physical or mental harm or pain to a vulnerable adult.

We hold that the BOA erroneously applied the law to the facts when it concluded that Ocak's conduct rose to the level of neglect, and we affirm the superior court's reversal of the final order finding neglect.

FACTS

Ocak is the mother, guardian, and caregiver for her developmentally delayed adult son, I.O. I.O. has down syndrome and obsessive compulsive disorder. He has lived with his mother and she has cared for him his entire life.

In 2018, I.O. received an assessment that resulted in a Person Centered Service Plan. This assessment concluded that I.O. required high levels of supervision and should not be left unattended. At the time of this assessment, I.O. qualified for 117 Community First Choice in-home care hours per month. Ocak was his paid care provider for those hours. I.O. also received annual State Supplementary Payment (SSP) funds in lieu of Individual Family Services (IFS), meaning that I.O. received $2,400 in annual SSP funds, rather than IFS waiver services, which would include respite care and other services.

Due to his mental health conditions, I.O. has a history of eloping from his home without alerting anyone. When these elopements occur, I.O. engages in unsafe and unlawful behaviors such as shoplifting, walking into oncoming traffic, and trespassing. Ocak has tried various strategies to mitigate this behavior, such as: installing an alarm system in her home, purchasing I.O. a watch with GPS tracking, moving his bedroom next door to her bedroom, and cultivating relationships with local law enforcement and business owners so they would be familiar with I.O. in the event that he wandered off. Each time he has eloped, Ocak called 911 to report him missing, and he was returned home safely by law enforcement or a family member.

Ocak has also enlisted the support of mental health providers at Sound Mental Health (SMH) to help address these behaviors. Ocak and I.O. have worked closely with Mariah Zeise, an SMH counselor, since 2019. Zeise submitted a declaration describing her professional opinion of I.O.'s situation to the court, stating:

I and other professionals at [SMH] have discussed I.O.'s situation at length and concluded that Norma Ocak is doing an admirable job caring for I.O. I.O. has very challenging behaviors. He has certain things that he wants to do, and he is determined to do them. . . . We believe that his challenging behaviors would most likely lead to a failed placement in an Adult Family Home []. The other living option would be a residential supported living placement, where the supervision would be greater. Because I.O. is determined to do certain things (e.g., go out on [his] own, get frequent haircuts, etc.), he could get extremely upset if someone tried to stop him. We worry that he might lash out at a supported living provider, resulting in harm to the provider or himself. . . . My impression is that at no point did Norma act in a neglectful way. She has always provided the means to maintain the health and safety of I.O. His mental health disorder and developmental disability lead to him making poor, unsafe choices. From my perspective, Norma has always taken action when I.O. has made unsafe choices and has actively sought support and resources when his behavior does get unmanageable. . . . I have never observed anything in my interactions with Norma Ocak or I.O. that would have led me to consider making [a negligence] report.

Administrative Record (AR) at 411-12.

I.O. was jailed twice while eloping. On one of these occasions, he stayed in jail for two days because no one picked him up. Ocak believed that someone from SMH would pick him up and take him home as part of the crisis plan to address I.O.'s elopements, but because it was a weekend, no one was available. Jennifer Goodwin, Personal Recognizant Screener at Seattle Municipal Court, testified that I.O was frightened and angry during his time in jail. Goodwin recalled that I.O. repeatedly pounded on his cell door, yelled "mom" over and over, and cried. AR at 116. She recalled that jail staff were very upset that I.O. had remained in jail. Ms. Goodwin opined that it was very traumatic for I.O. to be in jail. I.O. was ultimately picked up by his brother.

Adult Protective Services (APS) began an investigation into Ocak pursuant to allegations of neglect. Based on its investigation, APS notified Ocak that:

From approximately July 6th 2019 through August 24th, 2019, a vulnerable adult under your supervision eloped at least once a week. As a person with [a] "duty of care," it is your responsibility to assure that he is safe and you are meeting his needs. Furthermore, the vulnerable adult's Service Plan negotiated with [Developmental Disabilities Administration] states, "the vulnerable adult requires supervision during awake hours and can't be left alone." The vulnerable adult has

3

many interactions and reported instances with the Seattle Police Department. He has a history of crossing the streets unsafely, where vehicles had to swerve or brake to avoid hitting him; has made many trips to emergency rooms due to unsafe behaviors; and has been the subject of Missing Person Reports. Additionally, you have been offered in-home supports to help with supervision, and you have rejected these options. Based upon your lack of supervision, you place the vulnerable adult in clear and present danger.

AR at 251.

Ocak requested a hearing before the office of administrative hearings. At the hearing, an initial order was entered upholding APS's finding of neglect. Ocak appealed. The BOA affirmed the initial order and entered a final order concluding that Ocak had neglected I.O. under former RCW 74.34.020(16)(a) and (b) (2020).[1] When the neglect finding became final, Ocak could no longer work as I.O.'s individual provider. Ocak appealed the BOA final order to Thurston County Superior Court, which concluded substantial evidence did not support a finding of neglect under RCW 74.34.020(15) and reversed the BOA's order. The Department appeals to this court.

## ANALYSIS

### I. ABUSE OF VULNERABLE ADULTS

The Department argues that Ocak's actions and inactions demonstrate a serious disregard of consequences of a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, as well as a pattern of conduct or inaction that fails to avoid or present physical or mental harm or pain to a vulnerable adult. We disagree.

---

[1] RCW 74.34.020 was amended in 2021 and the definition of neglect was shifted to subsection (15) from subsection (16), effective July 1, 2022. *See* LAWS OF 2021 ch. 215 § 162. At the time of the BOA's final order, the citation for the definition of neglect was RCW 74.34.020(16). For ease of reading, we will cite to the current statute subsection (15) in this opinion as no language pertinent to our review was amended.

A. Standard of Review

We may grant relief from final agency action when "[t]he agency has erroneously interpreted or applied the law" or "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter." RCW 34.05.570(3)(d)-(e). We review such a contention de novo, but "'give substantial weight to [the agency's] interpretation of the law when subjects fall within [the agency's] area of expertise.'" *Woldemicael v. Dep't of Soc. & Health Servs.*, 19 Wn. App. 2d 178, 181-82, 494 P.3d 1100 (2021) (quoting *Pac. Coast Shredding, LLC v. Port of Vancouver*, 14 Wn. App. 2d 484, 502, 471 P.3d 934 (2020)). "The party challenging the agency action has the burden of demonstrating the invalidity of the action." *Beatty v. Fish & Wildlife Comm'n*, 185 Wn. App. 426, 443, 341 P.3d 291 (2015); RCW 34.05.570(1)(a).

B. Legal Principles

Chapter 74.34 RCW governs the Abuse of Vulnerable Adults (AVA). The basis for the neglect finding in the final order at issue here is RCW 74.34.020(15):

> "Neglect" means (a) a pattern of conduct or inaction by a person or entity with a duty of care that fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety.

The statute does not further define "serious disregard" or "clear and present danger." *Woldemicael*, 19 Wn. App. 2d at 182. Our duty in statutory interpretation is to discern and implement the legislature's intent. *Lowy v. PeaceHealth*, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012). When we interpret a statute or regulation, it gives the words in that statute or regulation their plain and ordinary meaning. *Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 322, 190 P.3d 28 (2008) (plurality opinion); *Stevens v. Brink's Home Sec., Inc.*, 162 Wn.2d 42, 47, 169 P.3d 473 (2007). We decipher a statute in such a way as to give effect to all language used, rendering no part superfluous. *In re Det. of Ambers*, 160 Wn.2d 543, 552, 158 P.3d 1144 (2007); *State v. Young*, 125 Wn.2d 688, 696, 888 P.2d 142 (1995). We may look to related statutes when interpreting a regulation. *Mader v. Health Care Auth.*, 149 Wn.2d 458, 473, 70 P.3d 931 (2003). Questions of statutory or regulatory interpretation are reviewed de novo. *Tesoro Ref. & Mktg. Co.*, 164 Wn.2d at 316.

C.	The BOA Erroneously Applied the Statutory Neglect Standard in Concluding that Ocak Committed Neglect under RCW 74.34.020(15)

Here, the BOA found the elements of (a) a pattern of actions or omissions by Ocak leading to harm to I.O. and (b) her "serious disregard of consequences of such a magnitude as to constitute a clear and present danger" to him. RCW 74.34.020(15)(b). The circumstances of this case as a whole do not support this finding.

1.	RCW 74.34.020(15)(b): "Serious disregard of consequences"

The Department was required to establish that a person with a duty of care to the vulnerable adult committed "an act or omission . . . that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety." RCW 74.34.020(15)(b). The definition of neglect in the AVA is similar to the definition in the Abuse of Children Act. *See* RCW 26.44.020(19). Notably, both statutes

6

contain the key terms "serious disregard of consequences" and "clear and present danger." *See* RCW 74.34.020(15); RCW 26.44.020(16). But the *Brown* court determined that the statute's definition of "negligent treatment" that referenced "serious disregard of the consequences" to be distinct from the regular definition of negligence: "failure to exercise such care as a reasonable person would exercise under the same or similar circumstances." *Brown v. Dep't of Soc. & Health Servs.*, 190 Wn. App. 572, 590, 360 P.3d 875 (2015). The court reasoned that "serious disregard" is a higher standard than simple negligence, and is more analogous to the utter disregard for another's safety test applied to claims of wanton misconduct. *Id*.

In this case, the Department argues that the standard in *Brown* does not apply to this case after the decision in *Woldemicael*, 19 Wn. App. 2d at 182. In *Woldemicael*, the court declined to apply the *Brown* standard to cases of adult neglect, because the relationship between a parent and a minor child implicates the fundamental right to parent while the relationship between a caregiver and a vulnerable adult does not. *Id*. The Department in this case is correct that the heightened standard in *Brown* does not apply here because this case deals with neglect of a vulnerable adult. Nevertheless, as the *Woldemicael* court concluded "serious disregard requires more than simple negligence." 19 Wn. App 2d at 182. Ocak's conduct does not reach this standard. While the heightened standard in *Brown* does not apply, neither does simple negligence.

There is no dispute that Ocak owed I.O. a duty of care. There is also no question that Ocak failed to prevent I.O. from eloping into the community unsupervised. But the fact of I.O. eloping does not necessarily lead to the conclusion that Ocak's actions and inactions constitute a serious disregard of the consequences to such a magnitude that it created a clear and present danger to I.O. In fact, the record shows Ocak took numerous actions to prevent elopement, demonstrating that she *did* regard the consequences. Such actions included installing an alarm system, getting I.O. a

7

GPS watch, moving his bedroom next to her bedroom, taking him outside every day for exercise to alleviate his wanderlust, cultivating relationships with local law enforcement and business owners, calling 911 to report him missing, and working with SMH counselors. Sadly, those measures were not always enough, but this alone does not establish that Ocak's conduct amounts to neglect. On the contrary, the measures Ocak took tend to show a serious regard for the potential consequences of I.O.'s elopements. The BOA erroneously applied the statutory neglect standard when it concluded that Ocak's omissions rose to a level of "serious disregard of consequences" in light of all of the actions she took to prevent I.O.'s elopements.

2.  RCW 74.34.020(15)(a): "fails to avoid or prevent physical or mental harm"

In its final order, the BOA concluded at conclusion of law 17 that Ocak neglected I.O. as defined in RCW 74.34.020(15)(a) through her "repetitive failure to ensure the necessary service of adequate supervision of I.O. when he was out in public" that "constitute a pattern of conduct or inaction [] that failed to provide the critical service of supervision to maintain I.O.'s physical or mental health." AR at 53. We agree with Ocak that the BOA erred in this conclusion because there was no nexus between her conduct and the harm to I.O.

The Department was required to establish a pattern of actions or omissions by Ocak which lead to I.O.'s harm. *See* RCW 74.34.020(15)(a). The Department argues that by not requesting additional services for I.O. and instead opting to receive a $2,400 annual supplemental payment, Ocak engaged in neglect and caused harm to I.O. The Department contends that these services would have prevented I.O.'s elopements because they would have provided additional supervision, and that Ocak "repeatedly failed to request appropriate services for him and failed to provide services to him that she was required to provide under his plan of care." Br. of Dep't at 40. We disagree.

8

The respite services the Department refers to are not supervisory services. They are meant to assist with day to day activities. I.O. only qualified for 117 hours of these services per month, which amounts to less than 4 hours of care per day. I.O. could have certainly eloped while using these services, not to mention when respite services were *not* being provided during the remaining 20 hours in the day. The Department does not demonstrate how utilizing respite services would have prevented I.O.'s elopements. Instead, the Department assumes a nexus exists because Ocak is I.O.'s legal guardian and care provider. This assumption does not support a neglect finding under RCW 74.34.020(15)(a).

Further, the Department argues that Ocak opting for the $2,400 per year SSP in lieu of additional care hours demonstrates a failure to accept appropriate services for I.O. But Ocak used this payment to ensure I.O. had money to purchase things he enjoys, like haircuts, food, and magazines. These items also mitigated I.O.'s feelings of anger and aggression. Again, the Department fails to show that additional care hours would have prevented I.O.'s elopements. This argument suffers from the same shortsightedness as the Department's argument regarding respite services: it ignores that the problem of a grown adult willfully eloping exists around the clock. For the aforementioned reasons, the BOA erroneously applied the statutory neglect standard when it concluded that Ocak's omissions establish a pattern of behavior that lead to I.O.'s harm, because there is no nexus between Ocak's choice of services and harm to I.O. Conclusion of law 17 was entered in error.

### 3. Public Policy

Ocak argues that our public policy should not be that developmentally delayed adults cannot live at home with their family members because if they wander off, the family members will be found to have committed neglect. We find this argument persuasive.

The Department argues that based on I.O.'s history with wandering off into the community, he should have been in an adult family home. But I.O.'s SMH counselor, who knows the family well, testified that placement in an adult family home would not have been a good fit for I.O., and Ocak had reason to believe this is not what I.O would have wanted. I.O. has been cared for by his mother for his entire life, and has lived in the same house for nearly 30 years. He was distressed being separated from his family when he spent the weekend in jail, crying and calling out for his mother. Opting to not place I.O. in an adult family home does not amount to a repeated failure to take protective action. Rather, it was a decision made based on what was in the best interest of I.O.

It also cannot be that the only acceptable place for someone like I.O. is in a locked facility. While placement in a facility may have ensured he could not elope, he would be separated from his mother who has cared for him every day up until this point. Rigidly applying these statutes would come at a large cost to the mental and emotional health of vulnerable adults and place families in an impossible situation.

Finally, Ocak assigns errors to numerous findings of fact. But, because we conclude that the BOA erred in determining Ocak committed neglect, we need not reach whether the findings of fact are supported by substantial evidence.

We conclude that even though the BOA applied the correct neglect standard under RCW 74.34.020(15), it erroneously applied the law to the facts when it entered conclusion of law 17 and ruled that Ocak neglected I.O. We affirm the superior court's decision that reversed the BOA's neglect finding.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Maxa, J.

_____
Glasgow, C.J.