# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| AKBERET TEKLE, | No. 57090-4-II |
| Appellant, | |
| v. | |
| WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | UNPUBLISHED OPINION |
| Respondent. | |

CRUSER, A.C.J. – Larry was an elderly resident of an adult family home (AFH) owned and operated by Akberet Tekle. Larry was not diagnosed with cognitive impairment and did not have problems with his memory. He did have mobility issues, and his negotiated care plan (NCP) stated that Tekle was responsible for arranging his transportation and that he was not able to leave the AFH without assistance.

On August 6, 2019, Larry decided to leave the AFH to see a movie in downtown Vancouver. Tekle was not able to arrange state-funded transportation for him due to the short notice, and no staff member was available to drive him. Tekle tried to convince Larry to change his plan, but he was adamant about going to the movie. Larry left the AFH, against Tekle's protests, and took the bus to the movie theater. Before he left, he showed Tekle the money he had in his pocket, told her his planned bus route, and told her to call police if he was not back at the AFH by 6:00 PM.

Upon leaving the movie theater, Larry boarded the wrong bus and got lost. Meanwhile, around 6:00 PM, Tekle called Larry's sister to inform her of the situation, had Tekle's own sister drive downtown to look for Larry, and called local hospitals. At 7:22 PM, a transit employee called the police to assist Larry, who was waiting at the bus barns. At 7:26 PM, Tekle called police to report Larry missing. He was returned to the AFH around 8:00 PM.

The Department of Social and Health Services (Department or DSHS) opened two investigations after the incident. First, it investigated licensing violations relating to Tekle's failure to follow Larry's NCP and failure to timely report him missing. Tekle had to complete an improvement plan and pay a fine to keep her business open. Second, it investigated her for neglect. On the investigator's recommendation, the Department found that Tekle had neglected a vulnerable adult. She received a hearing before an Administrative Law Judge (ALJ), who affirmed the Department's finding. The DSHS Board of Appeals again affirmed. Tekle appealed to the Superior Court, which transferred the appeal directly to this court for review.

Tekle argues that the Board incorrectly applied the law when it affirmed the finding of neglect. She also argues that certain findings of fact were unsupported by substantial evidence and requests attorney fees. We reverse the Board and vacate Tekle's neglect finding because Tekle could not have prevented Larry from leaving either by restraining him or by calling 911 sooner. Therefore, her failure to follow Larry's NCP and failure to timely call 911 do not show a serious disregard for Larry's safety and cannot support a finding of neglect.

FACTS

A. Akberet Tekle and Larry

Akberet Tekle is a small business owner who runs two AFHs. Tekle has been a professional caregiver since 1999 and is qualified as a Certified Nursing Assistant. In addition to caring for the residents of her AFHs, she cares for her 23-year-old son who has Cerebral Palsy. Tekle lives with her husband and son at her first AFH, St. Mary. Tekle's other AFH is called Orchard's Family Home.

Larry was admitted to live in Orchard's AFH in April 2019, at the age of 72 or 73. When Larry moved into the AFH, he had recently been released from the hospital after several months of inpatient treatment for complications from a fall that occurred five months earlier, in December 2018. Until his fall, Larry lived alone and would go to the movies every Tuesday when showings were half price at the downtown Vancouver theater.

In March 2019, before transferring Larry to the AFH, the Department performed a care assessment to evaluate his needs. The care assessment stated that Larry suffered from general weakness, poor balance, and an unsteady gait. It also stated that Larry required extensive physical assistance with his mobility, might stumble while walking, and required a wheelchair to travel distances. It stated that his short- and long-term memory was "OK" but that he struggled with decision-making and lacked awareness of consequences. Administrative Record (AR) at 316.

In May 2019, shortly after Larry moved into the AFH, Larry and Tekle prepared and signed a Negotiated Care Plan (May NCP). An NCP is "a tool to document a client's functional ability and determine eligibility for long-term care services." 1 Verbatim Report of Proceedings (VRP) at 31. Larry's May NCP provided that Larry could not make his own transportation arrangements

and that Tekle would assist him to make arrangements to go to the movies as able. It also stated that Larry was "impulsive and unaware of consequences" and "not able to make safe decisions." AR at 276. It described Larry's memory as "adequate" and indicated that he had no memory impairment, but that he "requires reminders, cues, supervision and daily organized routine." *Id.*

Between April 2019 and August 2019, Larry's mobility improved to the extent that he could go to medical appointments by himself. Attending these appointments involved walking from the drop-off point into the building and taking the elevator to the fourth floor unaccompanied. Tekle coordinated Larry's transportation to and from those appointments through C-TRAN, the local public transit authority, but did not attend the appointments with him.

Larry's primary care provider, Melissa Paul, testified that Larry had "always been able to voice his needs" and that she had no concerns about Larry being out in the community without a caregiver. 3 VRP at 14. Larry began seeing Paul in April 2019 and would see her every one or two months. Paul testified that Larry self-directed his own medical care, with the exception of dietary changes and medication dosages, which were joint decisions. Paul did not recall Larry's wounds impacting his mobility in April 2019. She also testified that, aside from an elevated liver enzyme that caused irritability, Larry had no cognitive impairment.

B. August 6, 2019 Incident

On the morning of August 6, 2019, around 8:00 AM, Larry decided he wanted to go to the movies to see *Fast and Furious*. Tekle was not able to take him to the movies because she had to bring her son to a medical appointment and did not have enough notice to arrange other transportation for Larry. She could not arrange a ride with C-TRAN because they require 24-48 hours advance notice. She asked Larry to change his plan to another day so that she could take him

4

herself, but Larry refused. Tekle testified, "When I asked him in the morning to change his plan, he said he was not going to do that. He was adamant." 1 VRP at 95. Larry confirmed that Tekle tried to stop him from going to the movie. He testified that he "didn't think [he] needed help" on his outing that day. 2 VRP at 30.

Larry eventually agreed to stay at the AFH, so Tekle left for her son's appointment. When Tekle left, her husband was the sole caregiver at the AFH. Shortly thereafter, Tekle received a call from her husband telling her that Larry was leaving, so she returned to the AFH. When she returned, Larry was in the driveway or on the road walking away from the AFH. According to Tekle's husband, Larry had returned to drop off his jacket before leaving again. Tekle again tried to stop Larry, but he refused to change his plan, and left the AFH around 9:30 AM. Tekle sent her husband to her son's appointment and stayed at the AFH to care for the other three residents.

Before Larry left the AFH, Tekle asked him if he had money with him and what his bus route was. Larry reached into his pocket and showed Tekle his money and a paper that had bus route numbers written on it, that Larry had prepared himself. Tekle believed that Larry's ID was also in his pocket, but later learned that he had forgotten it in his jacket pocket. Along with his ID, Larry left his cell phone at home because it was not working at the time. Tekle was concerned, but believed that Larry would be able to ask questions and get help from those around him if needed. She did not believe he was in imminent danger, but was concerned about him having the address for where he needed to go, and getting enough to eat and drink while out. Larry told Tekle that he would return to the AFH by 6:00 PM and to call 911 if he was not home by then.

When Larry left, around 9:30 AM, he walked about a block and a half to the bus stop. He testified that he had no trouble walking that day. Larry missed the first bus to his destination and

had to wait 45 minutes for the second bus, which caused him to miss the first showing of his movie. He attended the second showing, which started at 3:00 PM. Upon leaving the theater, Larry caught the wrong bus, so he was dropped off at the local transit hub ("bus barns"). 2 VRP at 31. Larry testified that he did not need any assistance until he reached the bus barns, and when asked if he felt safe that day, said that he "was feeling good." *Id.* At 7:22 PM, a transit employee called 911 and reported that Larry was found "wandering" and "doesn't know where he lives." AR at 302 (capitalization omitted).

Meanwhile, around 6:00 PM, Tekle called Larry's sister, Karen Stephenson, who suggested reaching out to local hospitals and looking for him at the theater. Tekle then called her own sister, who went to search for Larry. Next, Tekle called two hospitals. Finally, Tekle called 911. Tekle testified that she called 911 around 6:00 PM, but the 911 incident report reflects that her call was received at 7:26 PM. Officers were en route to collect Larry by 7:40 PM.

Larry was returned to the AFH around 8:00 PM. Investigators later concluded that Larry may have sustained a scratch on his arm while away from home that day because they observed a Band-Aid on his arm. However, Larry testified that he "didn't fall or nothing" and that "it doesn't take much" to leave a scratch "at this age." 2 VRP at 32. The same evening, Tekle and Larry drafted an agreement stating that Larry was not safe to leave the AFH alone and that in the future he should let Tekle know so she can make arrangements.

C. Investigations and Remedial Actions

Shortly after Larry's incident, Tekle and her business were subject to two separate DSHS investigations. First, Orchard's AFH was subject to a Residential Care Services (RCS) investigation of its failure to report Larry missing and its failure to comport with Larry's NCP.

6

Second, Tekle was subject to an Adult Protective Services (APS) investigation led by Monica Haertel. APS and RCS are each separate branches of DSHS, with RCS handling "licensing, certification, and regulatory oversight to long-term care facilities" while APS "investigates reports of abuse, neglect, and exploitation of vulnerable adults." *Aging and Long-Term Support Administration*, DEP'T OF SOC. & HEALTH SERVS., https://www.dshs.wa.gov/altsa (last visited Oct. 31, 2022).

The RCS investigation resulted in citations under WAC 388-76-10225 (reporting requirement) and WAC 388-76-10400 (care requirement). To keep her license and continue operating her AFH, Tekle was required to pay a civil fine of $1,500 and complete a plan of correction. RCS returned for an inspection in October 2019 and determined that the AFH was back in compliance.

The APS investigation resulted in Haertel recommending a substantiated finding of neglect. Haertel's recommendation was based in large part on the home's failure to follow Larry's NCP. In her investigation, Haertel interviewed Larry, Karen (Larry's sister), Tekle,[1] Tekle's husband, Paul, Larry's home health services provider, and the police officer who aided Larry on August 6th.

Taking another remedial step after the incident, Tekle and Larry signed a new NCP on August 26, 2019 (August NCP). The August NCP is nearly identical to the May NCP; for example, both provide that Larry is "impulsive and unaware of consequences" and "is not able to make safe decisions." AR at 276, 179. The August NCP also provides that Tekle will "set up State funded

---

[1] Notably, Tekle required an Amharic interpreter at the hearing before the ALJ in this matter, but her interview with Haertel was conducted without an interpreter and without checking her understanding of the English language.

transportation . . . to go to the movie" and "ensure [Larry] returns home after movie is over on CVAN." *Id.* at 179-80. The August NCP describes Larry's memory as "adequate," but in contrast to the May NCP, the August NCP indicates that Larry has "[m]emory impairment." *Compare id.* at 276, *with id.* at 179.

D. ALJ Hearing and Board of Appeals Review

As a result of the APS investigation, DSHS found that Tekle had neglected a vulnerable adult and notified her of this finding. Tekle requested and was granted a hearing before an ALJ. The ALJ heard testimony from Haertel, Tekle, Larry, and Paul. Tekle's testimony was facilitated by an Amharic interpreter. The ALJ affirmed the Department's finding.

Tekle appealed from the ALJ's order and her case went before the DSHS Board of Appeals. The Board affirmed the Department's finding of neglect in August 2021. In its order, the Board entered 36 findings of fact, and Tekle challenges five of them in this appeal.

The Board went on to conclude that DSHS had proven each of the elements of neglect, by demonstrating that Tekle committed an act or omission that constituted a serious disregard of the consequences, and the disregard was of such magnitude to constitute a clear and present danger to Larry's health. Tekle challenges this conclusion, as well as the specific conclusions set forth below:

> 12.3 [Tekle]'s act or omission was the act of allowing Larry to leave the AFH by himself, without his identification or a working phone, and in contradiction to numerous provisos, warnings, and admonitions in his May 2019 NCP. Moreover, her failure to call 911, either at the outset of the incident, as she herself said she should have done, or as the first response upon [Larry's] failure to return, was an additional omission to act. Further, [Tekle] attempted to justify her acts and omissions by arguing that in her opinion Larry was able to function safely in the community by himself despite what the NCP said, repeatedly. This argument was defeated first by the fact that she was wrong, because Larry was not able to function in the community that day successfully. Her argument is defeated as well because

20 days after the movie incident, she created and signed an NCP that was even more restrictive and prescriptive regarding Larry's ability to go into the community and to the movie theater. This August NCP completely adopted the restrictions of the May NCP, so [Tekle] cannot argue that the May NCP was "too restrictive" when she signed an even more restrictive NCP in August 2019. Finally, one may infer from [Tekle]'s testimony that she felt she had "no choice" but to act as she did in letting Larry do what he wanted to do, first, because it was his "right," and second, because she had an obligation to take her son to an appointment. Indeed, a caregiver or an owner of an AFH may well face many dilemmas, but those presented here were not unresolvable had [Tekle] been insistent that she had to follow Larry's care plan with regard to his transportation to and from the movies.

*Id.* at 23.

12.4 [Tekle]'s act in letting Larry go into the community by himself was a serious disregard of Larry's health, welfare, and safety. This serious disregard was beyond mere negligence. . . . [Tekle]'s act in letting Larry go into the community by himself and her failure to act to remedy this situation, was a serious disregard of his health and safety as he had a history of falls, and his NCP from May 2019 – just 3 months prior to his movie trip – said he had an unsteady gait, poor balance, and generalized weakness. Moreover, there were ample statements in both the care assessment and the May NCP that Larry's mental acumen was at the very least diminished – he was not able to manage his finances, not able to arrange his own transportation, he was forgetful about his medication, and the NCP stated he was "not physically or mentally capable of getting out of the house without assistance." Letting Larry leave the AFH under these conditions was therefore more than mere negligence.

*Id.* at 24.

In this conclusion of law, the Board went on to analyze the term serious disregard, concluding that one acts with serious disregard when they engage in conduct despite " 'knowing or having reason to know of facts that would lead a reasonable person to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result.' " *Id.* at 25 (quoting *Brown v. Dep't of Soc. & Health Servs.*, 190 Wn. App. 572, 590, 360 P.3d 875 (2015)) (emphasis omitted). Based on this interpretation, the Board concluded that

9

it was ***reckless or serious disregard*** for [Tekle] to allow Larry to leave the AFH with a recent history of having fallen and being unable to get up until he was discovered by a neighbor several days after the fall and after having developed severe pressure sores. Moreover, his gait was unsteady, he may stumble, and he had poor balance. Further, he lacked the ability to make safe decisions about his health and safety, he acted impulsively, and he was unaware of the consequences. These warnings were stated in his care assessment and the NCP which [Tekle] had created based on the assessment. Finally, her failure to call 911 either when Larry insisted on leaving, or as soon as she realized he was gone for an unreasonable time, is additional ample evidence of a serious disregard of his health and safety.

*Id.*

The Board, in this conclusion, further stated that "[t]he warnings, advice, and requirements of the NCP, as well as the care assessment, were all proved viable by the very incident that ensued: Larry was not capable of successfully being in the community by himself at the time of the incident just as the NCP and care assessment had stated, and all of which [Tekle] knew." *Id.* at 26. The Board went on to discuss whether the serious disregard was of such magnitude as to constitute a clear and present danger to Larry, concluding:

> If [Tekle] had merely not noticed that Larry had slipped out the door to ride a bus to the movies, ***perhaps*** that would have been "mere negligence." But here [Tekle] was fully aware of Larry's plans, was fully aware of his May NCP and his care assessment, and after the movie incident, drafted and signed the August NCP that was even more restrictive regarding Larry's movements in the community as had been the May NCP. Therefore, [Tekle]'s arguments that she thought the May NCP was "too restrictive" and that from her observations Larry would be perfectly fine in the community, were defeated both by her creation of the August NCP and by the very fact that Larry was indeed not able to be in the community by himself, just as the May NCP and care assessment had stated. [Tekle]'s acts were therefore not mere negligence and created a clear and present danger to Larry, which were proved to be clear and present when he was unable to find his way home after 9 hours in the community.

*Id.* at 26-27.

Tekle appealed to Thurston County Superior Court, which transferred the appeal to this court. Tekle assigns error to findings of fact 6, 13, 25, 26, and 31 as unsupported by substantial evidence. Tekle also challenges conclusions of law 12, 12.3, 12.4, and 12.5 of the Board's final order and conclusions of law 12-18 of the ALJ's initial order as erroneous. Tekle also argues that DSHS acted arbitrarily and capriciously and that it improperly deprived her of protected liberty interests. Finally, Tekle requests attorney fees.

## ANALYSIS

### I. STANDARD OF REVIEW

Under the Washington Administrative Procedure Act (WAPA), this court "may reverse an administrative order (1) if it is based on an error of law, (2) if it is unsupported by substantial evidence, (3) if it is arbitrary or capricious, (4) if it violates the constitution, (5) if it is beyond statutory authority, or (6) when the agency employs improper procedure." *Ames v. Wash. State Health Dep't Med. Quality Health Assurance Comm'n*, 166 Wn.2d 255, 260, 208 P.3d 549 (2009). We may affirm the agency action on any theory adequately supported by the administrative record. *Heidgerken v. Dep't of Nat. Res.*, 99 Wn. App. 380, 388, 993 P.2d 934 (2000).

We review issues of fact for substantial evidence. *Ames*, 166 Wn.2d at 261. We review issues of law de novo. *Id.* at 260. In doing so, we may substitute our own judgment for the judgment of the administrative body, but we afford substantial deference to the agency's interpretation when the issue falls within its area of expertise. *Id.* at 260-61.

II. VULNERABLE ADULT STATUTE

A. LEGAL PRINCIPLES

Washington's Chapter 74.34 RCW codifies the Abuse of Vulnerable Adults Act, which protects vulnerable adults from abuse and neglect. This statute defines "[n]eglect" in relevant part as:

> an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

Former RCW 74.34.020(16)(b) (2018). A neglect finding must be made by a preponderance of the evidence. WAC 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. "This standard means that it is more likely than not that something happened or exists." *Id.*

We recently held that a finding of neglect of a vulnerable adult requires showing that the alleged perpetrator " 'committed an act or omission;' " that " 'the act or omission demonstrated a serious disregard of consequences;' " and that " 'the disregard was of such a magnitude to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety.' " *Woldemicael v. Dep't of Soc. & Health Servs.*, 19 Wn. App. 2d 178, 183-84, 494 P.3d 1100 (2021) (quoting the record); Former RCW 74.34.020(16)(b). Under the second prong, "serious disregard requires more than simple negligence." *Woldemicael*, 19 Wn. App. 2d at 182.

As a result of a DSHS finding of neglect, individuals are placed on a registry preventing them from being employed in a position or holding a license that involves caring for vulnerable adults or children and from working or volunteering in a position with unsupervised access to vulnerable adults or children. RCW 74.39A.056(2); WAC 388-76-10120(3); WAC 388-76-

10125(2); WAC 388-76-10135(6); WAC 388-76-10180; RCW 26.44.100(2)(c), .125(2)(e); WAC 388-113-0030(1).[2]

The Abuse of Vulnerable Adults Act does not mention NCPs; they are instead mandated by the portion of the administrative code governing the licensing of AFHs. *See* WAC 388-76-10355. AFHs are required "to develop a written negotiated care plan" that includes "[a] list of the care and services to be provided," identifies "who will provide the care and services," and specifies "[w]hen and how the care and services will be provided." WAC 388-76-10355(1)-(3). "The adult family home must implement each resident's negotiated care plan." WAC 388-76-10365; *see also* WAC 388-76-10400.

B. APPLICATION

Tekle argues that the Board erred in finding that she neglected Larry, specifically challenging conclusions of law 12, 12.3, 12.4, and 12.5. In support of this argument, Tekle also argues that substantial evidence does not support the Board's findings of fact 6, 13, 25, 26, and 31. Having reviewed the findings, we conclude all are supported by substantial evidence except for the last three sentences of finding 26 and the portion of finding 31 stating that Larry was "not able" to go to the movies on his own. AR at 13. However, the findings do not support the Board's legal conclusions, for the reasons detailed below.

Tekle contends that the Board erroneously applied the law in concluding that she neglected Larry. Specifically, she argues that the Board erred in concluding that (a) Tekle "did an act or omission;" that (b) "the act or omission demonstrated a serious disregard of the consequences;"

---

[2] The neglect finding was not only career ending for Tekle, it also prevents her from being designated as a caregiver for her adult son.

and that (c) "the serious disregard was of such a magnitude to constitute a clear and present danger to [Larry's] health, welfare, or safety." Br. of Appellant at 32 (quoting AR at 21-22).

A finding of neglect of a vulnerable adult requires showing "an act or omission by a person or entity with a duty of care[3] that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety." Former RCW 74.34.020(16)(b). The relevant statute does not further explain "serious disregard" or "clear and present danger." *See id.* However, the "serious disregard" element "requires more than simple negligence." *Woldemicael*, 19 Wn. App. 2d at 182.

Under RCW 34.05.570(3)(d), we may grant relief from final agency action when "[t]he agency has erroneously interpreted or applied the law." We review issues of law de novo. *Ames*, 166 Wn.2d at 260. In doing so, we may substitute our own judgment for the judgment of the administrative body, but we afford substantial deference to the agency's interpretation when the issue falls within its area of expertise. *Id.* at 260-61. Tekle has the burden of proving that the Board erroneously applied the law. RCW 34.05.570(1)(a).

### i. Whether Tekle Committed an Act or Omission

The Board concluded that "[Tekle]'s act or omission was the act of allowing Larry to leave the AFH by himself, without his identification or a working phone, and in contradiction to numerous provisos, warnings, and admonitions in his May 2019 NCP." AR at 23. It went on to conclude that "[Tekle's] failure to call 911, either at the outset of the incident, as she herself said she should have done, or as the first response upon [Larry's] failure to return, was an additional omission to act." *Id.*

---

[3] Tekle does not dispute that she owed Larry a duty of care.

Tekle argues that she cannot be punished for " 'allowing' " Larry to leave because she could not have physically restrained him to prevent him from leaving. Br. of Appellant at 33 (quoting AR at 23). She does not dispute that failing to call 911 earlier was an omission, but instead argues that calling sooner would not have resulted in a different outcome and that it was not "sufficient" to warrant a finding of neglect. *See id.* at 42.

To the extent Tekle argues that she did not commit an act or omission, we disagree. An "omission" is a "failure to do something." *Omission*, Black's Law Dictionary at 1311 (11th ed. 2019). The undisputed evidence shows that Tekle did not accompany Larry to the movies or arrange transportation for him. Moreover, the undisputed evidence shows that Tekle did not call 911 when Larry first left, and calling 911 was not her first response when Larry did not return home as scheduled. Tekle's failure to accompany Larry to the movies or provide him with transportation arrangements, and her failure to call 911 as a first response, therefore, were omissions.

### ii. Whether Tekle's Conduct Demonstrated a Serious Disregard of the Consequences

Tekle argues that the Board impermissibly relied on hindsight when assessing the severity of her conduct. Tekle also argues that the Board erred when it downplayed Larry's legal right to leave the facility and ignored the fact that Tekle was the only caregiver at the facility when Larry left. Tekle further argues that the Board erred by relying extensively on the May NCP but disregarding Larry's primary care provider's testimony about Larry's cognitive abilities and ability to safely go into the community unaccompanied.

*(a) Reliance on hindsight*

We agree with Tekle that the Board impermissibly relied on hindsight when it based its legal conclusions on subsequent events rather than focusing on Tekle's dilemma at the time of her omissions. *See* AR at 23 ("[Tekle] was wrong, because Larry was not able to function in the community that day successfully") ("20 days after the movie incident, [Tekle] created and signed an NCP that was even more restrictive and prescriptive."); 26 ("The warnings, advice, and requirements of the NCP, as well as the care assessment, were all proved viable by the very incident that ensued: Larry was not capable of successfully being in the community by himself at the time of the incident just as the NCP and care assessment had stated."); 27 ("[Tekle]'s arguments that she thought the May NCP was 'too restrictive' and that from her observations Larry would be perfectly fine in the community, were defeated both by her creation of the August NCP and by the very fact that Larry was indeed not able to be in the community by himself, just as the May NCP and care assessment had stated.").

Division Three of this court has explicitly rejected the use of hindsight to support a finding of child neglect. *Brown*, 190 Wn. App. at 596. We likewise reject the Board's hindsight reasoning here because the law does not ask whether a negative outcome occurred, but whether Tekle's omission "demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to [Larry's] health, welfare, or safety." Former RCW 74.34.020(16)(b). This should be decided based on what Tekle knew at the time of her omission, what Larry's physical and mental capacities showed, and what Tekle's lawful options were under the circumstances.

*(b) Improper reliance on the May NCP*

In addition to reasoning from hindsight, the Board relied heavily[4] on Tekle's failure to meet the requirements of Larry's May 2019 NCP when it concluded that her conduct amounted to serious disregard. True, an AFH "must implement each resident's negotiated care plan." WAC 388-76-10365. But that is a licensing requirement, not a legal standard for what constitutes neglect, and the Department cites no authority demonstrating that it has been interpreted as such. Thus, the mere fact that Tekle's conduct did not conform with the NCP is not dispositive.

*(c) Tekle's authority to restrain Larry*

Tekle's conduct here does not rise to the level of "serious disregard" because Tekle could not have lawfully stopped Larry from leaving the AFH, either by restraining him or by calling police sooner. AR at 24. The Board failed to give adequate weight to this aspect of Tekle's dilemma when it concluded, without explanation, that Tekle's dilemma was "not unresolvable." *Id.* at 23. By assuming that Tekle could have changed Larry's conduct if she simply insisted on following the NCP, the Board ignored the basic realities of the situation and incorrectly applied the law.

The overwhelming evidence shows that Larry was committed to leaving the AFH on his own, despite Tekle's best efforts to stop him. Tekle testified that on the day in question, "despite my advise [sic] not to go, he refused. He didn't want to stop. So he left. And I didn't want to force him." 1 VRP at 90. She also testified, "I had already talked in the morning to postpone his plan to

---

[4] In its over-reliance on the May NCP, the Board wrote that the NCP stated that Larry was " 'not physically or mentally capable of getting out of the house without assistance.' " AR at 24. Though this part of the Board's reasoning was not specifically challenged by Tekle, it is worth noting that this quotation was in the May NCP under the heading "Emergency Evacuation" and appears limited to that context. *Id.* at 270.

another day. . . . When I asked him in the morning to change his plan, he said he was not going to do that. He was adamant." *Id.* at 95. Larry's testimony corroborates that Tekle tried to stop him from leaving, but he chose to go to the movie anyway. His testimony shows that Larry "didn't think [he] needed help" on his outing that day, and suggests that he would not have left willingly had the police arrived to collect him from the movie theater any sooner. 2 VRP at 30.

Given that Larry was adamant about going to the movies that day, Tekle could not have done any more to stop him from doing so. Vulnerable adults do not lose their autonomy when they are admitted to live in an AFH. *See* Former RCW 70.129.005 (2012). They have a "right to be free from physical restraint" unless restraints "have been assessed as necessary to treat the resident's medical symptoms and addressed on the resident's negotiated care plan." RCW 70.129.120; WAC 388-76-10655.[5] Thus, Tekle could not have restrained Larry to prevent him from leaving the AFH. Nor could police have seized Larry against his will to return him to the AFH, even if Tekle had called 911 immediately. *See* RCW 70.129.007; CONST. art. I § 7; U.S. CONST. amend. IV; XIV. The Board, therefore, erred when it based its conclusion on the incorrect assumption that Tekle could have stopped Larry had she "been insistent that she had to follow Larry's care plan with regard to his transportation to and from the movies." AR at 23.

---

[5] Physical restraint is defined as "a manual method, obstacle, or physical or mechanical device, material, or equipment attached or adjacent to the resident's body that restricts freedom of movement or access to his or her body, is used for discipline or convenience, and not required to treat the resident's medical symptoms." Former RCW 70.129.010(5) (1997).

We hold that Tekle's conduct did not amount to a serious disregard[6] within the meaning of the relevant statute, and accordingly, we need not address the final element, "clear and present danger." Former RCW 74.34.020(16)(b). We therefore reverse the neglect finding.[7]

## ATTORNEY FEES

Tekle requests attorney fees and costs under the Equal Access to Justice Act (EAJA), RCW 4.84.350. Under the EAJA, "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." RCW 4.84.350(1).

A "[q]ualified party" is "an individual whose net worth did not exceed one million dollars at the time the initial petition for judicial review was filed." RCW 4.84.340(5)(a). Tekle is a qualified party because her net worth does not exceed one million dollars.

A "substantially justified" action is one that would satisfy a reasonable person and that had a reasonable basis in law and in fact. *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 892, 154 P.3d 891 (2007) (plurality opinion). "[I]t need not be correct, only reasonable." *Raven v. Dep't of Soc. & Health Servs.*, 177 Wn.2d 804, 832, 306 P.3d 920 (2013). "The relevant factors in determining whether the Department was substantially justified are, therefore, the strength of the

---

[6] Additionally, Tekle's conduct did not amount to serious disregard because Tekle ensured that Larry had money and knew the bus routes to and from his destination, had the opinion he would be safe based on her prior experience with Larry in the community, and was aware that he safely attended medical appointments without a caregiver present.

[7] Because we reverse the neglect finding for the reasons above, we need not reach Tekle's argument that the Department's actions were arbitrary and capricious and that it deprived her of a protected liberty interest.

factual and legal basis for the action, not the manner of the investigation and the underlying legal decisions." *Silverstreak*, 159 Wn.2d at 892.

The Department argues that its actions were substantially justified because RCW 74.34.067(10) affords it no discretion to decline to pursue a finding of neglect when an investigation merits such a finding. It also insists that public policy weighs against a fee award here because such awards may chill future investigations.

Although the EAJA "contemplates that an agency action may be substantially justified, even when the agency's action is ultimately determined to be unfounded," we cannot overlook the thin factual and legal basis underlying the Department's pursuit of Tekle. *Raven*, 177 Wn.2d at 832. The APS Investigator, Haertel, recommended a substantiated finding of neglect based in large part on Tekle's failure to follow Larry's NCP. It was not reasonable for the Department to view a privately negotiated plan of care as if it set the legal standard for neglect of a vulnerable adult. In treating Tekle's failure to follow the NCP as if it constituted per se neglect, the Department took an unreasonable view of the law and ignored the facts that made following the NCP impossible.

In addition to its unreasonable reliance on the NCP, the Department also unreasonably assumed that Tekle had more power and control over Larry's conduct than she did. As discussed above, Tekle could not have physically restrained Larry to prevent him from leaving, and police could not have seized Larry if they had been contacted any earlier. Even Haertel agrees that a care provider like Tekle cannot lawfully stop a resident from leaving the AFH when the resident insists upon doing so. The Department's view, that Tekle could have changed Larry's conduct if she simply insisted on following the NCP, is wholly disconnected from the facts in the record and, therefore, is not substantially justified.

Finally, the Department's pursuit of a neglect finding was unjustified here because the law provides other remedies for the deficiencies in Tekle's conformity with Larry's care plan. Tekle's AFH was subject to an RCS investigation and was cited for licensing violations due to its failure to report Larry missing and its failure to comport with Larry's NCP. To keep her license and continue operating her AFH, Tekle was required to pay a civil fine of $1,500 and complete a plan of correction. RCS returned for an inspection and found the AFH was back in compliance. Because NCPs are licensing requirements, this appears to be a reasonable course of correction for the violation that occurred. Pursuing a finding of neglect, on the other hand, was unreasonable and was not substantially justified under the circumstances.

We grant Tekle's request for attorney fees under the EAJA because the Department's finding of neglect did not have a reasonable basis in law or fact and Tekle is a qualified party.

CONCLUSION

We reverse the Board of Appeals decision and vacate the Department's neglect finding. We also grant Tekle's request for attorney fees.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

No. 57090-4-II

CRUSER, A.C.J.

We concur:

MAXA, J.

LEE, J.