IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>V.W.,<br><br>               Minor Child. | No. 84395-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Infant V.W. struggled to gain weight in the care of his mother, M.W., who has cognitive disabilities. After several hospital stays, V.W. had a nasogastric (NG) tube inserted to ensure adequate nutrition. M.W. was unable to learn how to properly use the NG tube. Based on concerns about V.W.'s failure to thrive in M.W.'s care, the Department of Children, Youth, and Families (the Department) petitioned for dependency for V.W., resulting in an order of dependency and out-of-home placement.

M.W. appeals the finding of dependency based on abuse or neglect and the trial court's determination that the Department made reasonable efforts to prevent the need for V.W.'s removal from the home. M.W. also challenges the court's disposition ordering her to refrain from cannabis use. We affirm.

FACTS

M.W. first became involved with the Department in 2012, when B.W., her 10-month-old child, struggled to gain weight. The Department filed a petition for

dependency, to which both parents agreed. Social workers observed that M.W. and the father were not feeding B.W. adequately, did not appear to understand his development needs, and did not follow directions for feeding. A psychological assessment focused on parenting capacity or fitness to parent diagnosed M.W. with cognitive difficulties, including borderline intelligence and Cognitive Disorder NOS.[1] Psychological testing showed that M.W.'s ability to recall verbal and visual information after a 20- to 30-minute delay was in the "Extremely Low" range. Her delayed memory performance was consistent with Cognitive Disorder. The report identified weaknesses such as "limited intelligence, poor memory functioning, and extremely poor academic skills. She lacks basic skills to structure, organize or plan." Additionally, M.W. "does not appear to understand what led to her child being placed in foster care, and does not consider what she provided to be abusive or neglectful." The assessment noted that "[t]o be helpful for her services need to accommodate her learning disabilities, limited intelligence, and memory problems. She should not be expected to read and comprehend what she reads." M.W. subsequently relinquished her rights to B.W.

The child who is the subject of this dependency action, V.W., was born in February 2021 to M.W. and an unknown father.[2] The Department received a "risk-only intake" shortly after M.W. gave birth to V.W. due to its previous

---

[1] "NOS" means not otherwise specified.

[2] While V.W.'s birth certificate names M.W.'s husband as the father, M.W. acknowledges that her husband is not the biological father, and a paternity test confirms this. M.W. does not know the name or whereabouts of her husband or V.W.'s biological father. At the time of the trial, M.W.'s husband was seeking to disestablish paternity and dissolve the marriage.

involvement with B.W., as well as possible instability in M.W.'s housing situation in a "tiny house village."[3]

In May 2021, the Department received an intake reporting that 3-month-old V.W. was admitted to Swedish Hospital for inadequate weight gain and failure to thrive, with concerns that he was not being fed enough. Dr. Mark Johnson, primary care physician for M.W. and V.W., made the referral because V.W. was not gaining weight as needed for proper development. Dr. Johnson testified that "despite all the medical interventions I recommended and knew of [V.W.] was still not gaining weight appropriately. When [V.W.] was in the hospital with all the support and all the nursing care, [V.W.] was able to gain weight. But when [V.W] wasn't in the hospital, he wasn't gaining weight."

During V.W.'s stay at Swedish Hospital, social worker Alizia Shook worked with M.W. She testified that M.W. was frustrated and did not have a lot of patience with V.W. during feeding. Shook explained that M.W. was required to be present in the room for 24 hours while V.W. was gaining weight before discharge. However, V.W. lost weight during the time he was in M.W.'s care at the hospital. In order to discharge successfully, Shook and the Department worked to create a plan for additional community health supports and resources to assist M.W.

---

[3] A tiny house village is comprised of small units, each with power and a shared kitchen and bathroom. The record is unclear as to whether each unit has running water. M.W. testified that she had running water. However, social workers testified the units did not have running water.

Shook believed the Department needed to stay involved due to concerns V.W. would lose weight upon returning home to fulltime care by M.W.[4]

Swedish Hospital discharged V.W. to his mother's care. Eight days after V.W. left the hospital, Dr. Johnson, noted that his weight had decreased, he had an elevated pulse, and he showed evidence of dehydration. M.W. took V.W. to Seattle Children's Hospital (SCH). After several days in the hospital, medical testing revealed no medical diagnosis to explain V.W.'s weight loss. SCH physician Dr. Jessica Meikle believed his faltering growth was due to inadequate formula intake because of feeding difficulty. V.W. was a "tricky feeder" and was not meeting feeding goals, even when fed by experienced staff. Additionally, Dr. Meikle was "concerned that perhaps he wasn't offered enough opportunities to feed based on his mother's recall of the feeding regimen and what the nurses observed in the hospital of her ability to stick to a feeding schedule." A nurse observed M.W.'s frustration and overheard her tell a fussing V.W., "Why don't you just shut up already. You have kept me up since two a.m."

As a result of V.W.'s inadequate formula intake by mouth, SCH placed an NG tube and established a strict schedule of seven feeds a day with formula

---

[4] The Department's petition alleged additional facts relating to V.W.'s earlier hospital stays. For example, it alleges that when M.W. provided care, the time between feeds was too long and the feeds themselves were too short. It also alleged that despite the nursing team providing M.W. with extensive education, reminders, and prompts for feedings, M.W. was "inconsistent" in her ability to provide care including properly mixing formula and adding extra formula "for the calories" and that the incorrect formula to water ratio can lead to dehydration. But at trial, the evidence relating to feeding deficiencies focused primarily on the later hospital stay at Seattle Children's, through testimony from Dr. Meikle, nurses, and social workers from Seattle Children's. We do not consider the unsupported allegations from the petition.

offered by mouth and the residual fed through the NG tube. An NG tube goes into the nostril and down to sit in the stomach. Caring for an NG tube requires training in feeding and basic maintenance, as well as additional training in how to place the tube in the nose and stomach. The first step for an NG tube feed involves mixing the formula to the dietician's recommendation. For pump-fed NG tubes, the caregiver must insert a cartridge into the pump and press a button in order to prime the tubing to get the air out of the line. Then, the caregiver programs the pump with the rate and dose of the feed.[5] Prior to attaching the pump to the NG tube, the caregiver must verify the placement of the NG tube in the stomach by injecting a small amount of air with a syringe and listening to the stomach with a stethoscope. Once placement is confirmed, the caregiver connects the tube from the pump to the NG tube and starts the pump. If programmed correctly, the pump will provide the feed and stop automatically. When the feeding is completed, the NG tube must be flushed with water. NG tube care also requires changing the tape that secures the tube to the face.

The hospital provided M.W. with training on how to use the NG tube, but she had significant difficulty determining the amount of formula to feed and programming the pump. M.W. was never able to master the process of tube feeding. She also refused to document V.W.'s intake on a feeding chart. A pediatric nurse with SCH testified that M.W. "seemed to be under a lot of stress and frustrat[ed] with being in the hospital and with needing to learn how to use

---

[5] Rate is how fast the feed will go, while dose is the volume the patient will receive.

the NG and how to use the pump." Jennifer Hoerner, a SCH social worker, similarly testified that M.W. "was often frustrated and often overwhelmed," particularly with recording feeds and learning the NG tube and pump. M.W. expressed to Hoerner that she would not follow the feeding plan or record the feeds. At one point, Hoerner ended the requirement of filling out the feeding chart because "it seemed counterproductive at the time because she wasn't doing it anyway, and it was creating extra stress for her to be asked about that." Hoerner was concerned that V.W. would not be safe if discharged to his mother because "[M.W.] was very clear that she would not be following the recommended feeding plan . . . and she struggled with learning the—the care through the NG . . . ."

When V.W. was nearing discharge, M.W. was required to complete a 24-hour room-in where she would provide 100 percent of his care, but she was unable to successfully do so. The Department filed for dependency in June 2021. The court held an uncontested shelter care hearing, and V.W. was placed in the care of Felicia Parker and Christina Stevens, M.W.'s aunt and her wife. Parker and Stevens live in Tacoma. The court specified a minimum of six hours of monitored family time for M.W., but feeding could be provided only by those who had completed NG tube training.

V.W. has lived with Parker and Stevens since the shelter care hearing. While with Parker and Stevens, the Department has facilitated visits for M.W. and additional NG tube training sessions.

6

The court held a dependency hearing in June 2022. After several days of testimony by doctors, nurses, social workers, and M.W., the trial court found V.W. to be dependent. The court also ordered continued placement out-of-home with Parker and Stevens. And the court ordered services including a psychological evaluation, parenting instruction, NG tube feeding training, random urinalyses (UAs) for 90 days, and engaging with Dr. Johnson and a trained addiction physician or pain management consultant for drug assessment and use of a supplement called Kratom.[6]

M.W. appeals the order of dependency, out-of-home placement, and disposition.

## DISCUSSION

"Dependency proceedings are designed to protect children from harm, reunite families, and help parents alleviate the problems that led to intervention." Dep't of Soc. & Health Servs. v. Fox, 192 Wn. App. 512, 523, 371 P.3d 537 (2016). A dependency proceeding allows courts to order remedial measures to preserve and repair family ties. Id. To declare a child dependent, the court must hold a hearing on the dependency petition. RCW 13.34.110(1). "A dependency hearing is a fact-finding inquiry, the purpose of which is to determine whether the State can meet its burden of showing the child is dependent as defined by statute." In re Dependency of K.N.J., 171 Wn.2d 568, 579, 257 P.3d 522 (2011).

---

[6] At the time of the trial, M.W. reported daily use of Kratom, a legal supplement with opioid-like properties.

The Department has the burden of establishing by a preponderance of the evidence that a child is dependent under RCW 13.34.030. RCW 13.34.110(1); K.N.J., 171 Wn.2d at 580.

Under RCW 13.34.030(6), a dependent child is any child who

(a) Has been abandoned;
(b) Is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child;
(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

If the court finds the State has proven the child is dependent under RCW 13.34.030(6), the court must then determine placement of the child and the services to be provided. In re Dependency of Schermer, 161 Wn.2d 927, 942, 169 P.3d 452 (2007).

An appellate court reviews an order of dependency to determine whether substantial evidence supports the court's findings of fact and whether those findings support the conclusions of law. In re Welfare of X.T., 174 Wn. App. 733, 737, 300 P.3d 824 (2013). The reviewing court does not reweigh evidence or determine credibility. Id.

M.W. challenges the court's finding of dependency under RCW 13.34.030(6)(b), V.W.'s out-of-home placement, and the cannabis prohibition in her disposition.

I.      Challenged Findings of Fact

M.W. challenges several of the trial court's findings of fact.[7] We review findings of fact for substantial evidence, which exists when, viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true. In re Dependency of A.C., 1 Wn.3d 186, 193, 525 P.3d 177 (2023). Unchallenged findings of fact are verities on appeal. In re Est. of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

A.      M.W.'s Role in Causing V.W.'s Weight Loss[8]

In finding of fact 2.2.13, the trial court states, "it is more probable than not that [V.W.'s] weight losses while in [M.W.'s] care were substantially or wholly due to [M.W.'s] failing to provide [V.W.] sufficient opportunities to feed and then prematurely ending feedings out of frustration and impatience." In finding of fact 2.2.14, the court discusses Dr. Johnson's concern that M.W. was not feeding V.W. sufficient calories or liquids and notes that Dr. Johnson was concerned the deficient feedings "could cause a progressive positive feedback loop, meaning her deficient feedings could lead to [V.W] refusing food and fluids," which could possibly result in death. Finding of fact 2.2.15 states "the progressive positive feedback loop concern appears to have been realized," noting that V.W. required

---

[7] M.W. cites the court's findings that she was not following written instructions or completing the feeding charts (finding of fact 2.2.8), claiming the court faulted her for these issues despite evidence that she could not comprehend and had limited ability to write. She argues, "[t]o the extent the court relied on these findings to support its ultimate findings that the Department made reasonable efforts or that [she] neglected V.W., they lack substantial evidence." Based on this argument, rather than challenging the finding of fact, M.W. challenges whether the finding of fact supports the court's conclusions of law on neglect and reasonable efforts.

[8] Findings of fact 2.2.13, .14, .15, .16.

9

an NG tube to ensure adequate nutrition and did not develop an oral aversion. Finding of fact 2.2.16 relies on the previous findings to find it probable that M.W. "induced a progressive positive feedback loop, i.e., that her deficient feeding exacerbated his feeding issues," leading to the need for the NG tube, and that her deficient care "placed his health in clear and present danger." M.W. argues these findings of fact misconstrue the medical evidence.

At trial, a pediatric nurse from SCH testified that V.W. was a "tricky feeder" even for an experienced feeder, noting, "I don't think even myself could get him to take an entire bottle just on his own by mouth." Dr. Johnson stated that V.W. was more difficult to feed than most babies and had "a difficult time ingesting sufficient calories to maintain his growth curve."

Dr. Johnson's testimony about the "progressive positive feedback loop" pertained to his concerns about possible repercussions from dehydration. He stated that "[d]ehydration *can be* a progressive feedback loop where dehydrated children will refuse additional food, additional fluid, and eventually get to the point where it can cause complications that could be severe."[9] However, Dr. Johnson did not testify that V.W. was experiencing this feedback loop, but rather that his signs of dehydration were concerning because the problem *could* arise as a result. Thus, to the extent that the court found a "progressive positive feedback loop" had been realized (finding of fact 2.2.15) and that M.W. induced this loop

---

[9] (emphasis added).

10

(finding of fact 2.2.16), these findings are unsupported by substantial evidence in the record.

Nevertheless, in addition to evidence that V.W. was difficult to feed, the testimony and unchallenged finding of fact 2.2.12 also establish that M.W. was often frustrated and impatient during the feeds and would end them too early. Also unchallenged was the court's finding that it "credits [SCH pediatrician] Dr. Meikle's conclusion that M.W. did not offer V.W. enough opportunities to feed."[10] Therefore, substantial evidence supports the court's alternative phrasing in finding of fact 2.2.16 that M.W.'s "deficient feeding exacerbated his feeding issues such that [V.W.] needed an NG tube."

Thus, while V.W.'s weight loss may not have been "wholly" due to M.W.'s failure to provide adequate opportunities to feed, the evidence shows that V.W. could take in sufficient calories by mouth during his hospitalization at Swedish when cared for by the nurses, but lost weight when M.W. was responsible for care and after discharge.[11] In the hospital, M.W. demonstrated frustration and impatience and missed nighttime feedings.[12] These problems compounded an

---

[10] Dr. Meikle did not testify directly to this conclusion but said she was "concerned that perhaps he wasn't offered enough opportunities to feed based on his mother's recall of the feeding regimen and what the nurses observed in the hospital . . . .". The unchallenged finding of fact 2.2.11 did also note that Dr. Meikle "found no medical condition that was responsible for [V.W.'s] failure to thrive / faltering growth," which is supported by the testimony. When asked for her opinion about the reason for the feeding aversion, Dr. Meikle noted that V.W.'s mechanics of feeding appeared fine, so she did not fully understand why V.W. was so difficult to feed. She cited multiple possibilities, including that V.W. was born a few weeks premature, had intrauterine exposure to Kratom, and could just have an idiopathic reason for difficulty feeding. Dr. Meikle testified that ultimately, even if the cause for V.W.'s faltering growth was "multi-factorial," it "all related to inadequate calories given or taken in."

[11] Finding of fact 2.2.10.

[12] Finding of fact 2.2.12.

already difficult feeding situation. Thus, substantial evidence supports that M.W. "substantially" contributed to V.W.'s weight loss.

### B. Refusal to Follow the Feeding Schedule[13]

The trial court found that M.W. told Hoerner, the SCH social worker, that "she would not follow the hospital's feeding plan upon discharge, responding that she need not because she 'had been caring for him.' " The trial testimony supports this finding of fact. Hoerner testified, "[M.W.] said that she would not follow a feeding plan or record feeds when she [break in audio], felt that she had been caring for him and that was fine." In response to further questioning, Hoerner confirmed, "she was very clear that she would not be following the recommended feeding plan which was medically recommended to—to sufficiently give [V.W.] the nutrition that he needed." If M.W. did not understand the schedule, she did not express this to care providers. Instead, she refused to follow the medically necessary feeding plan. Substantial evidence supports the trial court's finding of fact.

### II. Negligent Treatment or Maltreatment

The trial court found V.W. dependent under both RCW 13.34.030(6)(b) (child is abused or neglected) and (c) (no parent, guardian, or custodian capable of adequately caring for the child). M.W. appeals only the court's determination

---

[13] Finding of fact 2.2.17.

as to RCW 13.34.030(6)(b).[14]

M.W. argues that the Department failed to prove that she acted with the requisite disregard for V.W.'s safety as required for a finding of abuse or neglect. The Department claims that M.W. knew the hospital determined she had to follow a certain feeding schedule and she refused, which amounted to neglect. We agree with the Department.

The trial court found V.W. dependent because he "is abused or neglected, as defined in chapter 26.44 RCW, by a person legally responsible for the care of the child." The definition of "abuse or neglect" in ch. 26.44 RCW includes "negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." RCW 26.44.020(1). "Negligent treatment or maltreatment" is further defined as "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." RCW 26.44.020(19).

The court interpreted this definition of "negligent treatment or maltreatment" in Brown v. Dep't of Soc. & Health Servs. when considering a Department finding of neglect separate from a dependency action. 190 Wn. App.

---

[14] Because the court also found V.W. dependent under RCW 26.44.030(6)(c) and M.W. does not challenge this statutory basis, V.W. will remain in dependency no matter the outcome of this appeal. Nevertheless, M.W. seeks reversal of the neglect finding under RCW 26.44.030(6)(b) because it "has serious consequences," including permanent inability to apply for certain licenses and "the stigma of a neglectful parent, which will follow her into any future dependency proceedings and interactions with the Department." For its part, the Department defends pursuing this additional basis for the dependency based on its obligation to protect children from abuse and neglect.

572, 586-87, 360 P.3d 875 (2015). Both M.W. and the Department argue that Brown supports their positions.

In Brown, the Department issued a finding of neglect because Brown failed to seek immediate medical treatment for a burn her young son received from scalding hot bath water while he was under the care of Brown's boyfriend. Id. at 575-76. The appellate court engaged in statutory interpretation of the definition of "negligent treatment and maltreatment," which RCW 26.44.020(19) defines as "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety . . . ."

The court concluded that the term "serious disregard" is synonymous with "reckless disregard" and implies a higher degree of culpability than want of reasonable care. Brown, 190 Wn. App. at 590. A person is in "reckless disregard" of another's safety by acting or failing to act on a duty, "knowing or having reason to know of facts that would lead a reasonable person to realize that the . . . conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result." Id. Thus, for the purposes of RCW 26.44.020(19), "negligent treatment" requires more than simple negligence. Id. at 588-91.

The court then considered Brown's behavior in light of this elevated standard, noting that she immediately returned home when her boyfriend called

her about the burn, researched burn care, and sought advice from knowledgeable sources. Id. at 594. She followed that advice by purchasing and applying burn cream, continuing to observe the burn and her son's behavior, and taking him to the hospital when she became concerned. Id. at 594-95. Based on these facts, plus the Department's failure to demonstrate that a health care provider would have prescribed different treatment had the child been seen earlier, the court concluded that none of the evidence showed a serious disregard of a magnitude constituting a clear and present danger and reversed the finding of neglect. Id. at 595.

M.W. claims that the Department had to prove that V.W.'s difficulty gaining weight resulted from her recklessness, that she "acted or failed to act while knowing of and disregarding a 'clear and present danger to [V.W.'s] health, welfare, or safety' that her act or omission posed." According to M.W., the record does not support such a conclusion because she brought V.W. to all of his appointments and obtained help when he failed to gain weight. M.W. claims that like the mother in Brown, because she recognized her son needed medical care and sought it out, her actions were not reckless and in disregard of the danger to her son's health. But unlike the mother in Brown, M.W. failed to follow the treatment plan recommended for her child.

The trial court's findings—which, as discussed above, were supported by substantial evidence—were that V.W.'s concerning weight loss was at least substantially due to M.W.'s failure to offer adequate opportunities to feed and

15

prematurely ending feedings. Additional unchallenged findings include Dr. Meikle's conclusion that M.W. failed to offer enough opportunities to feed, and care provider statements that she became easily frustrated and ended feeds prematurely. Dr. Meikle also found no medical conditions responsible for V.W.'s failure to thrive. Without the presence of an underlying medical condition, a child's failure to thrive can constitute circumstantial evidence of neglect "of a magnitude that constituted a clear and present danger to the child's health, welfare, and safety." In re Dependency of E.L.F., 117 Wn. App. 241, 247, 70 P.3d 163 (2003); In re Dependency of Lee, 200 Wn. App. 414, 436-37, 404 P.3d 575 (2017).

Moreover, M.W. knew that V.W. had a difficult time feeding and gaining weight, but she would not feed according to the medically determined plan. The testimony unequivocally demonstrated that V.W. gained weight when tended by hospital staff, but lost weight when M.W. assumed his care. Yet M.W. told SCH's social worker that "she would not follow the hospital's feeding plan upon discharge, responding that she need not because she 'had been caring for him.' " As the court noted, "[t]he implication of her statement was that she—not the hospital—knew best what [V.W.] needed."

While M.W. may have made these assertions to mask her confusion or her difficulty in understanding and implementing the feeding plan, she never expressed a lack of understanding to her providers. Rather, she stated that she would not follow the medical advice for how to address V.W.'s feeding issues—

not because she could not, but because she was choosing not to follow it. Even if M.W. had cognitive impairments, we cannot usurp her agency by ignoring her unequivocal statements expressing her choices.

M.W.'s failure to follow the hospital's feeding plan was more than mere negligence; she acted in "reckless disregard" of V.W.'s safety, while "knowing or having reason to know of facts that would lead a reasonable person to realize that the . . . conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result." Brown, 190 Wn. App. at 590. Given that V.W. lost weight when in M.W.'s care, yet she continued to assert that she would not follow the intensive feeding schedule under which V.W. gained weight, a preponderance of the evidence shows reckless disregard for V.W.'s health. The court did not err by determining that V.W. is a dependent child due to neglect under RCW 13.34.030(6)(b).

III.   Out-of-Home Placement

The trial court determined that it was contrary to V.W.'s welfare to return home and he should remain with M.W.'s aunts. M.W. argues the court erred by finding that the Department made reasonable efforts to eliminate V.W.'s removal because it did not tailor its services for her special needs. The Department contends the placement in relative care was a proper exercise of the court's discretion. We agree with the Department.

After a child is found dependent, the court must enter an order indicating whether the child will remain in or be removed from the home. In re Dependency

of K.W., 199 Wn.2d 131, 147, 504 P.3d 207 (2022). Out-of-home placement is

appropriate

> only if the court finds that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home, specifying the services, including housing assistance, that have been provided to the child and the child's parent, guardian, or legal custodian, and that prevention services have been offered or provided and have failed to prevent the need for out-of-home placement, unless the health, safety, and welfare of the child cannot be protected adequately in the home, and that:
> (a) There is no parent or guardian available to care for such child;
> (b) The parent, guardian, or legal custodian is not willing to take custody of the child; or
> (c) The court finds, by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063 would not protect the child from danger.

RCW 13.34.130(6). To satisfy the reasonable efforts requirement, the

Department must make an individualized plan tailored to the family's needs,

which should include services that are geographically accessible and tailored for

any parent with developmental disabilities. In re the Dependency of L.C.S., 200

Wn.2d 91, 107-08, 514 P.3d 644 (2022). Such services might include individual

and family counseling, substance abuse treatment services, mental health

services, assistance to address domestic violence, therapeutic services, and

transportation. RCW 13.34.025(2)(a). The court must make findings on the

record to support a conclusion that the Department made reasonable efforts.

L.C.S., 200 Wn.2d at 105. "In determining whether reasonable efforts have been

made, the court should consider the facts and circumstances of each parent." Id.

We review the court's decision on placement for abuse of discretion. Id. at 100. A court abuses its discretion if the decision is manifestly unreasonable or based on untenable grounds or reasons. K.W., 199 Wn.2d at 151. "A dependency court abuses its discretion when it makes a placement decision without considering all the factors." Id.

M.W. argues the court did not make reasonable efforts to prevent the need to remove V.W. from her home because the Department failed to confirm her disabilities and provide services tailored to them. In support, M.W. cites In re M.A.S.C., 197 Wn.2d 685, 689, 486 P.3d 886 (2021), for the proposition that "the Department had to make certain that services were offered according to 'current professional guidelines' for communicating with parents with similar limitations." However, M.A.S.C. discusses the Department's obligations in the context of termination of parental rights rather than dependency. Id. at 688-89. For terminations, the Department must prove that all necessary services were "expressly and understandably offered or provided" to the parent. Id. at 688. In cases where the Department has reason to believe a parent may have an intellectual disability, it must make reasonable efforts to determine whether the parent has a disability, how the disability could interfere with the parent's capacity to understand the services, and tailor services "in accordance with current professional guidelines to ensure the offer is reasonably understandable to the parent." Id. at 689.

This standard from the termination context—ensuring that all services are "expressly and understandably offered or provided" in accordance with current professional guidelines—is a higher standard than the standard of "reasonable efforts" tailored to the needs of the family in the dependency context. These rigorous requirements for termination are necessary in the context of the permanent deprivation of parental rights. In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). In contrast, a dependency is " 'a preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights." Id. (quoting In re A.W., 53 Wn. App. 22, 30, 765 P.2d 307 (1988)). As a result, "a dependency proceeding and a termination proceeding have different objectives, statutory requirements, and safeguards." Key, 119 Wn.2d at 609. The requirement for "expressly and understandably offered services" in keeping with current professional guidelines does not apply in the dependency context.

In addition to arguing for a higher standard for reasonable efforts based on her limitations, M.W. claims the Department failed to make reasonable efforts because (1) it did not confirm whether M.W. had a developmental disability that would entitle her to services and, (2) even if she did not meet the definition of disability, the Department did not try to accommodate her severe cognitive limitations.

The Department was aware that M.W. had cognitive disabilities, but also knew that she had not qualified for services. The 2013 assessment revealed M.W. had cognitive difficulties and reported a full-scale IQ of 75. The Washington

Developmental Disabilities Administration requires a full-scale IQ of 69 or below for services; therefore, M.W. would not be eligible. M.W. cites to several other types of disabilities[15] for which she could have been assessed and possibly received services. But Department social worker Jameela Muhammad testified that M.W. refused a psychological and neuropsychological evaluation when Muhammad raised the possibility.[16] Prior to a finding of dependency, the court cannot order examinations or evaluations without parent agreement. RCW 13.34.065(4)(j).

Although the Department was not able to order a cognitive or neuropsychological evaluation,[17] the record shows that various care providers, even if not informed of M.W.'s disabilities, observed her difficulties in adhering to the feeding regimen and attempted to find ways to teach her when she struggled. Dr. Johnson's office provided "exact measurement devices" for preparing formula, including a line on the bottle indicating the amount of water needed. His nurse also practiced making formula with M.W. In the hospital, nurses drew a line on a bottle to mark the amount of formula V.W. needed to consume. When training on the NG tube in the hospital the nurse explained the steps,

---

[15] See WAC 388-823-0015(1); RCW 71A.10.020(6).

[16] The psychological and neuropsychological testing services were offered in written service letters sent to M.W. Muhammad also testified that she "had talked to [M.W.] about a psychological and neuropsychological evaluation, which I explained to her was not court-ordered because . . . we don't have a dependency; we were just in shelter care. And she refused that service."

[17] Social workers did have access to the assessment of M.W. completed during the prior action involving B.W. Based on the prior evaluation from 2013 and interactions with M.W. related to V.W.'s care, social worker Muhammad submitted a declaration in support of a guardian ad litem (GAL) for M.W. However, after the court conducted a competency colloquy, the court determined M.W. was competent to proceed without a GAL.

demonstrated the steps, and had M.W. perform the steps with the nurse coaching. Because M.W. said she was a visual learner, the nurse provided handouts—a printout of a bottle with a line drawn at the milk line at the beginning of the feeding and a second bottle as an example with a line where the milk should be after the feeding. She included "a couple different scenarios" of the visual bottle. The nurse also provided a picture of the pump and wrote the rate M.W. would need to program in each different scenario.

After V.W.'s discharge from the hospital, the Department secured several extra individualized training sessions for the NG tube in which the nurse attempted to provide accessible education to M.W. The nurse tried many different methods—written materials and handouts, verbal explanations, hands-on, letting M.W. learn through doing and then trouble shooting. When M.W. had difficulty programming the pump, the nurse wrote out the dose and rate for reference. Additionally, the dietician altered the feeding amounts so that M.W. would not need to calculate the volume of the NG feed after bottle feeding. The nurses testified that this was significantly more training than they had ever provided a family. Thus, even without knowledge of a specific diagnosis or disability, the care providers tried various approaches and adapted their teaching methods in order to tailor their assistance to M.W.'s observed needs. The evidence of the providers' targeted efforts to communicate with M.W. so that she could understand and implement their training provides substantial evidence that

22

reasonable efforts were made to teach M.W. the skills she needed in order to prevent V.W.'s removal from the home.[18]

The court made specific findings in support of V.W.'s placement in relative care. The court found that the Department referred M.W. to the parenting education program Promoting First Relationships in May 2021, September 2021, and February 2022, but M.W. failed to respond until March 2022. The court further noted that M.W. participated in only one session out of what was supposed to be a series of 10, and no further sessions were held because she did not confirm visit times with the provider. The court's findings also state that M.W. refused the Department's offer of assistance in finding an apartment that could accommodate V.W.'s special needs and would not consider housing outside of the Capitol Hill area in Seattle. The court cited the Department's repeated efforts to schedule visitation and NG tube training, but M.W. often failed to respond to outreach and would not provide her schedule of appointments for the Department to work around to coordinate times. And when the Department was able to schedule visitation and/or training, M.W. "with some frequency" cancelled or missed the appointments.

---

[18] At oral argument, M.W. identified several examples of ways the Department failed to provide services in a manner accessible to her, including sending written services letters and expecting her to record feeding intake and perform calculations to program the feeding pump. However, she could not articulate what any *affirmative* additional reasonable efforts "would look like" that would have assisted her in the essential tasks of calculating formula intake and recording feedings. Wash. Court of Appeals oral argument, In the Matter of the Dependency of V.W., No. 84395-8-I (Nov. 2, 2023), at 3 min, 02 sec. to 5 min 57 sec., video recorded by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023111111/?eventID=2023111111.

The Department facilitated additional trainings on the NG tube. Even without knowledge of the details of M.W.'s cognitive impairment, the care providers used various methods to teach M.W. how to feed V.W. While ultimately unsuccessful, the Department made reasonable efforts to provide services to prevent V.W.'s removal from his home.

### IV. Requirement to Refrain from Cannabis

After finding a child dependent, the court can require parents to participate in services when the record supports the particular service. In re Dependency of W.W.S., 14 Wn. App. 2d 342, 363, 469 P.3d 1190 (2020). RCW 13.34.025 governs coordination of services in dependency cases and explicitly notes that the statute "does not create judicial authority to order the provision of services except for the specific purpose of making reasonable efforts to remedy parental deficiencies identified in a dependency proceeding." RCW 13.34.025(2)(d). For example, a court cannot impose a urinalysis requirement where the record does not contain evidence of a substance abuse issue requiring remedying as a parental defect. W.W.S. 14 Wn. App. 2d at 365. We review the juvenile court's decision to order a particular service for abuse of discretion. Id. at 364.

While the record contains no evidence of cannabis use specifically, M.W. has a history of opioid use and drug-seeking behavior. Dr. Johnson testified that he treated M.W. for chronic pain and a stable opiate use disorder. He expressed concern that M.W. had a pattern of requesting opioids for pain conditions that would not normally be treated with opioids. At the time of the trial, M.W. reported

daily use of Kratom. Dr. Johnson did not believe M.W. should use Kratom because of opioid-type side effects, including decreased focus and attention, and he had recommended she discontinue its use. Based on this testimony, the Department had concerns about M.W.'s use of both legal and illegal drugs. With this history, and her chronic pain and drug-seeking behavior, the trial court did not abuse its discretion by requiring M.W. to refrain from cannabis use, along with other lawful and unlawful substances.

## CONCLUSION

The trial court's findings of fact support the conclusion that V.W. was a dependent child under RCW 13.34.030(6)(b) due to abuse and neglect because M.W. demonstrated reckless disregard for his health. As required for out-of-home placement, the Department made reasonable efforts to prevent V.W.'s removal from his home which included several training sessions, employing different methods, to teach M.W. to use the NG tube. Finally, the court's requirement that M.W. refrain from cannabis is appropriate in light of her history of substance abuse and drug-seeking behavior.

Affirmed.

_Chung, J._

WE CONCUR:

Díaz, J.

Smith, C.J.